FILED IN
COURT OF CRIMINAL APPEALS

FEBRUARY 18, 2015

ABEL ACOSTA, CLERK

AP-77,054
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 2/17/2015 5:13:40 PM
Accepted 2/18/2015 8:47:07 AM
ABEL ACOSTA
CLERK

NO. AP-77,054

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

RODNEY REED,
*Appellant,*
v.
THE STATE OF TEXAS,
*Appellee.*

*Arising from:*

THE DISTRICT COURT
FOR THE 21st JUDICIAL DISTRICT,
BASTROP COUNTY, TEXAS

## BRIEF OF APPELLANT RODNEY REED

Bryce Benjet
State Bar No. 24006829
THE INNOCENCE PROJECT
40 Worth Street
New York, New York 10013
(212) 364-5340
(212) 364-5341 (fax)
Email: bbenjet@innocenceproject.org

Andrew F. MacRae
State Bar No. 00784510
LEVATINO|PACE LLP
1101 S. Capital of Texas Highway
Building K, Suite 125
Austin, Texas 78746
(512) 637-8565
(512) 637-1583 (fax)
Email: amacrae@levatinopace.com

**ORAL ARGUMENT REQUESTED**

IDENTITY OF PARTIES AND COUNSEL

District Attorney:                        BRYAN GOERTZ
                                          Criminal District Attorney
                                          804 Pecan Street
                                          Bastrop, Texas 78602


Counsel for the State:                    MATTHEW OTTOWAY
                                          Assistant Attorney General
                                          Bastrop County, Texas
                                          P.O. Box 12548
                                          Capitol Station
                                          Austin, Texas  78711

Appellant:                                RODNEY REED

Counsel for Appellant:                    BRYCE BENJET
                                          Attorney at Law
                                          THE INNOCENCE PROJECT
                                          40 Worth Street, Suite 701
                                          New York, New York 10013

                                          ANDREW F. MACRAE
                                          LEVATINO/PACE LLP
                                          1101 S. Capital of Texas Highway
                                          Building K, Suite 125
                                          Austin, Texas 78746

**REQUEST FOR ORAL ARGUMENT**

This is an appeal from the denial of a Chapter 64 DNA testing motion in a capital case. Appellant Rodney Reed was convicted in 1998 of strangling Stacey Stites to death with a belt. No physical evidence was found on the belt, the victim's outer garments, or any other items recovered at the scene. There were no eyewitnesses, and Reed's conviction was supported only by trace evidence in the form of semen that he and Ms. Stites had had sex – an event Reed admits, and which is not criminal. The State relied on a time of death estimate from the medical examiner, Dr. Roberto Bayardo, and scientific evidence regarding the length of time that sperm remain intact, to argue that Stite's death closely followed coitus, and that Reed therefore was the perpetrator.

The State's theory of the case has since been debunked as junk science by notable experts in the field, and Dr. Bayardo has testified in a sworn statement that the prosecution badly misconstrued his testimony. The evidence shows instead at least a 24-hour gap between coitus and collection of the semen, if not longer. These developments underscore the critical need to DNA test evidence handled by Ms. Stite's killer. Oral argument will greatly assist this Court in understanding the extensive factual record, complex procedural history, and, most importantly, how DNA testing of the murder weapon and other evidence handled by the killer can

exonerate Mr. Reed, possibly identify the real murderer, and ensure that justice is done.

# TABLE OF CONTENTS

**Page**

INDEX OF AUTHORITIES.................................................................................. viii

I. INTRODUCTION ....................................................................................1

II. SUMMARY OF ARGUMENT ...............................................................6

III. STATEMENT OF FACTS .....................................................................9

    A.     Background ...................................................................................9

           1.     The Murder Of Stacey Stites........................................................9

           2.     The Investigation........................................................................10

           3.     The State's Unsupported Scientific Evidence Results In Mr. Reed's Conviction ...........................................................11

    B.     Mr. Reed's Post-Conviction Proceedings .............................................13

           1.     New Scientific Evidence Eviscerates The State's Theory Of Reed's Guilt............................................................17

           2.     New And Mounting Evidence Corroborates Prior Testimony of Reed and Stites' Relationship And Reveals Fennell As An Abuser Of Police Power And A Serial Rapist Who Stated He Would Kills Ms. Stites If She Were Unfaithful By Strangling Her With A Belt .....................18

    C.     Mr. Reed's DNA Testing Requests And Motion...............................21

           1.     The State's stalling tactics concerning Mr. Reed's DNA testing requests........................................................................21

           2.     Mr. Reed files his DNA testing motion after the State rejects the majority of his testing requests.............................23

IV. ARGUMENT.......................................................................................38

    A.     Legal Standards and Standard of Review .............................................38

1. Chapter 64 Requirements ...........................................38

2. Bifurcated Standard Of Review On Appeal ...........................40

B. The District Court Wrongly Concluded That Mr. Reed Failed To Prove That Exculpatory DNA Test Results Likely Would Have Resulted In His Acquittal. (Issue 1)...........................................41

1. The State's Case Against Mr. Reed Was Highly Circumstantial, Based Upon Now-Debunked Junk Science And Tenuous Inferences, And Did Not Constitute A "Mountain Of Evidence" By Any Measure.........44

2. The Circumstantial Evidence Cited By The District Court Does Not Support Its Findings...................................................46

3. The District Court's Finding Regarding "Presence" Is Ambiguous And Should Either Be Clarified Or Reversed.......48

4. The District Court's Finding Regarding Time Of Death Was Based Upon Unreliable Testimony That Has Either Been (i) Debunked By The Prosecution's Own Witness And Other Experts, Or (ii) Was Given Solely By Jimmy Fennell, Who Was Strongly Incentivized To Lie To Avoid Prosecution...................................................49

5. The District Court's Finding Of Stites' Apparent Lack Of Consent Does Not Implicate Mr. Reed....................................51

6. The District Court Misapplied The Test For Determining Whether Mr. Reed Proved By A Preponderance Of The Evidence That Exculpatory DNA Test Results Likely Would Have Resulted In His Acquittal ...................................52

7. The Statutory Presumption Of Exculpatory DNA Test Results....................................................................53

8. The District Court Failed To Apply The Required Presumption That DNA Test Results Would Be Exculpatory ...............................................................57

C. The District Court's Conclusion That This Motion Was Brought For The Purposes Of Delay Is Not Correct (Issue 2)........................60

vi

1. The Standard Of Review .................................................................62

2. Mr. Reed's Motion Does Not Reflect An Intent To Cause Unreasonable Delay In The Execution Of Sentence Or The Administration Of Justice ..................................................63

3. Mr. Reed Was Not Required To Provide A Time Estimate For Testing (¶ 23a) .......................................................65

4. Mr. Reed Should Not Be Faulted For Filing His DNA Testing Motion On The Date The Court Scheduled His Execution (¶ 23b) ................................................................67

5. The legal basis for the DNA testing requested in this motion was not available until 2011 (¶ 23c) ...........................70

6. The 2011 Amendments To Chapter 64 ....................................71

7. Mr. Reed Suffered From A Legal Impediment Prior To The 2011 Amendments. ............................................................75

8. The District Court's "Intent" Inferences Drawn From Mr. Reed's Post-Conviction Proceedings Are In Error And Should Be Reversed (¶¶ 23d-g, l-m) .........................................76

9. Mr. Reed Provided Ample And Adequate Notice To The State of the Items Which He Sought To Test (¶¶ 23h-j). ........80

10. The District Court Erred In Finding That Reed Made Redundant Testing Requests (¶¶ 23j- m) ..................................82

D. Mr. Reed Met His Burden Under Article 64.01 With Respect To Chain of Custody And Biological Evidence. (Issue 3) .................86

1. Mr. Reed Has Established Chain Of Custody ..........................86

2. Mr. Reed's Unrebutted Expert Established That The Evidence He Seeks To Test Contains Biological Evidence .............................................................................89

CONCLUSION AND PRAYER ..............................................................92

# INDEX OF AUTHORITIES

Page

## CASES

*Anderson v. City of Bessemer*,
470 U.S. 564 (1985)..................................................................................60

*Blacklock v. State*,
235 S.W.3d 231 (Tex. Crim. App. 2007) .....................................................52

*Boykin v. State*,
818 S.W.2d 782 (Tex. Crim. App. 1991) ...............................................83, 91

*Brown v. State*,
No. AP-75469, 2006 WL 2069445 (Tex. Crim. App. 2006) .......................63

*Campos v. State*,
No. 01-14-00167-CR, 2014 WL 7204966 (Tex. App.—Houston, Dec.
18, 2014, no pet.) ......................................................................................40

*Dinkins v. State*,
84 S.W.3d 639 (Tex. Crim. App. 2002) .....................................................80

*District Attorney's Office for the Third Judicial District v. Osborne*,
557 U.S. 52 (2009).....................................................................................93

*Esparza v. State,*
282 S.W. 3d 913 (Tex. Crim. App. 2009) ..............................................45, 53

*Fain v. State*, 2014 WL 6840282
(Tex.App.—Fort Worth 2014, pet. filed) ...............................................*passim*

*Ex parte Giles*, No. AP-75712,
    2007  WL 1776009 (Tex. Crim. App. June 20, 2007) ..................................56

*Green v. State*,
    100 S.W.3d 344 (Tex. App. —San Antonio 2002, pet. ref'd) .......................40

*Ex parte Gutierrez,*
    337 S.W.3d 883 (Tex. Crim. App. 2011) .....................................................89

*Holberg v. State,*
    425 S.W.3d 282 (Tex. Crim. App. 2014) ................................................*passim*

*Ex parte Karage,*
    No. AP-75253, 2005 WL 2374440 (Tex. Crim. App. Sept. 28, 2005) .........56

*Kutzner v. State,*
    75 S.W.3d 427, 441-42 (Tex. Crim. App. 2002)...................................*passim*

*In re Luhr Brothers,*
    157 F.3d 333 (5th Cir. 1998) .......................................................................60

*Marine Shale Processors, Inc. v. U.S. Environmental Protection Agency,*
    81 F.3d 1371 (5th Cir. 1996) .......................................................................60

*Medellin v. State,*
    617 S.W.2d 229 (Tex. Crim. App. 1981) .....................................................87

*In re Morton*,
    326 S.W.3d 634 (Tex. App.—Austin 2010, no pet.)........................39, 51, 57

*Ex parte Phillips,*
    No. AP-76010, 2008 WL 4417288 (Tex. Crim. App. Oct. 1, 2008).............56

*Prystash v. State*,
    3 S.W.3d 522 (Tex. Crim. App. 1999) ..........................................................39

*Qadir v. State*,
    No. 02–13–00308–C.R., 2014 WL 1389545 (Tex.App.—Fort Worth
    Apr. 10, 2014, no. pet.)....................................................................................43

*Ex parte Reed*,
    271 S.W.3d 698 (Tex. Crim. App. 2008) .........................................8, 14, 20

*Ex parte Reed*,
    No. WR-50,961-03, 2005 WL 2659440 (Tex. Crim. App. Oct. 19,
    2005) ...............................................................................................................14

*Reed v. Stephens*,
    739 F.3d 753 (5th Cir. 2014) ..........................................................................15

*Routier v. State*,
    273 S.W.3d 241 (Tex. Crim. App. 2008) ............................................................
    39, 42, 44, 45, 48, 49, 51, 53, 55, 57, 58, 59, 69, 88, 92

*Skinner v. State*,
    122 S.W.3d 808 (Tex. Crim. App. 2003) ................................61, 63, 77, 84

*Smith v. State,*
    165 S.W.3d 361 (Tex. Crim. App. 2005) ................................40, 44, 62, 76

*State v. Rivera*,
    89 S.W.3d 55 (Tex. Crim. App. 2002) .........................................................44

*State v. Swearingen*,
    424 S.W.3d 32 (Tex. Crim. App. 2014) ..................................43, 52, 55, 92

*Stoker v. State*,
    788 S.W.2d 1(Tex. Crim. App. 1989) ...................................................86, 87

x

*Swearingen v. State*,
    303 S.W.3d 728 (Tex. Crim. App. 2010) ...........................................70, 71, 88

*Thacker v. State*,
    177 S.W.3d 926 (Tex. Crim. App. 2005) .....................................................62

*Whitfield v. State*,
    430 S.W.3d 405 (Tex. Crim. App. 2014) ....................................................90

*Wilson v. State*,
    No. AP-76835, 2012 WL 3206219 (Tex. Crim. App. Aug. 7, 2012) .....62, 79

**STATUTES**

28 U.S.C. § 2241(b) ....................................................................................13

Tex. Crim. Proc. Code Ann. art. 11.071, § 5(a) (West Supp. 2014) .......................75

Tex. Crim. Proc. Code Ann. art. 11.071, § 5(a)(1) (West Supp. 2014)...................74

Tex. Crim. Proc. Code Ann. art. 11.071, § 5(d) (West Supp. 2014) .................74, 75

Tex. Crim. Proc. Code Ann. art. 64.01(a)(1) (West Supp. 2014)..........38, 70, 71, 88

Tex. Crim. Proc. Code Ann. art. 64.01(b) (West Supp. 2014) ..........................38, 79

Tex. Crim. Proc. Code Ann. art. 64.01(a-1) (West Supp. 2014)................48, 87, 90

Tex. Crim. Proc. Code Ann. art. 64.03(a)(1) (West Supp. 2014)..........................38

Tex. Crim. Proc. Code Ann. art. 64.03(a)(1)(A)(ii) (West Supp. 2014) ................87

Tex. Crim. Proc. Code Ann. art. 64.03(a)(2) (West Supp. 2014)..........................38

Tex. Crim. Proc. Code Ann. art. 64.03(a)(2)(A) (West Supp. 2014) ................48, 90

Tex. Crim. Proc. Code Ann. art. 64.03(a)(2)(B) (West Supp. 2014) ....60, 62, 76, 78

Tex. Crim. Proc. Code Ann. art. 64.035 (West Supp. 2014).......................39, 55, 82

## OTHER AUTHORITIES

ABA, *Evaluating Fairness and Accuracy in State Death Penalty Systems: The Texas Capital Punishment Assessment Report* (Sept. 2013), available at www.americanbar.org/content/dam/aba/administrative/death_ penalty_moratorium/tx_complete_report.authcheckdam.pdf .........................5

Hearing on S.B. 122 Before Senate Crim. Justice Comm., 82nd Leg., R.S. (March 22, 2011) .................................................................................72

Hearing on S.B. 122 Before House Crim. Jurisprudence Comm., 82nd Leg., R.S. (May 10, 2011) .................................................................................72

H.J. of Tex., 82nd Leg., R.S. 4364 (2011).............................................................73

Indictment, *State v. Fennell,* No. 07-1752-K368 (368th Dist. Ct., Williamson County, Dec. 4, 2007).................................................................................21

Innocence Project, Know the Cases, http://www.innocenceproject.org/know/ ......51

Lisa Faulkenberg, Maybe Judge Is Just Dad's Girl, Houston Chronicle, Feb.16, 2011, http://www.chron.com/news /falkenberg/article/Falkenberg-Maybe-judge-is-just-dad-s-girl-1685509.php) .................................................................................14

*Ex parte Michael Morton*, No. AP-76663 (Tex. Crim. App. Oct. 12, 2011) ..........56

*Ex parte Reed*, No. WR-50,961-01 (Tex. Crim. App. Feb. 13, 2002)......................13

*Ex parte Reed*, No. WR-50,961-04, -05 (Tex. Crim. App. Jan. 14, 2009)..............14

*Ex parte Reed*, No. WR 50,961-06 (Tex. Crim. App. July 1, 2009) ........................14

*Reed v. State*, No. AP-73,135 (Tex. Crim. App. Dec. 6, 2000).........................11, 12

S.J. of Tex., 82nd Leg. R.S. 955 (2011) .................................................................73

Texas Bill Analysis at 6, S.B. 3, March 21, 2001...................................................86

## STATEMENT OF THE CASE

This is an appeal from an order entered in a capital case on December 12, 2014 by the District Court for the 21st Judicial District, Bastrop County, Texas (the "District Court"). C.R. at 342-48. Appellant Rodney Reed timely filed his notice of appeal on January 14, 2015. C.R. at 359-69. Appeal from a denial of a Chapter 64 motion in a capital case is a direct appeal to this Court. *See* Tex. Crim. Proc. Code Ann. art. 64.05 (West 2006).

## ISSUES PRESENTED

Issue 1: Whether the District Court wrongly concluded that Mr. Reed failed to prove that exculpatory DNA test results would likely have resulted in his acquittal?

Issue 2: Whether the District Court wrongly concluded that Mr. Reed's Chapter 64 motion was intended to unreasonably delay the execution of sentence or the administration of justice?

Issue 3: Whether Mr. Reed met his burden of showing (a) the presence of biological material on the items which Mr. Reed seeks to test, and (b) the chain of custody for such items?

# I.
# INTRODUCTION

This is an appeal from the denial of DNA testing in a capital murder case in which the identity of the killer was – and still is – hotly disputed. The murder weapon (a belt) and other evidence that Mr. Reed seeks to subject to DNA testing were handled by Ms. Stites' killer and, if tested, should conclusively exonerate Reed, and may identify the murderer. Reed is scheduled to die on March 5, 2015 for a murder he did not commit.

* * *

Ms. Stites was strangled to death with a belt with such force that the belt broke into two pieces. One piece of the belt was found near Ms. Stites' body, which was discovered along a rural roadside outside Bastrop, Texas. The other piece of the belt was located near a truck owned by Ms. Stites' fiancé, Jimmy Fennell, abandoned ten miles away at the local high school. The belt pieces matched the ligature marks on Ms. Stites' neck and were admitted into evidence at trial. Mr. Reed sought DNA testing of the belt and a tee shirt in 1999, but the court denied the request without a hearing. *See* App. 1[1] (motion requesting testing), App. 2 (State's opposition), and App. 3 (order denying motion).

---

[1]     References to pages in the Appendix filed with this brief are cited herein as "App. __."

At the November 25, 2014 DNA testing hearing (the "Hearing"), Mr. Reed presented unrebutted expert testimony that established that the person who handled the belt during Ms. Stites' strangulation and violent death left DNA on it, and that modern sophisticated "touch" DNA analysis of the belt and other evidence could conclusively identify the killer. ***Incredibly, neither piece of the belt has ever been subjected to DNA testing.***

Ms. Stites' body was roughly handled, dressed and dragged after her death. Thereafter, Stites' employee name tag was deliberately placed in the crook of her knee. Mr. Reed presented unrebutted expert testimony establishing that, like the belt pieces, the name tag contains DNA that may conclusively identify the person who placed the tag on Ms. Stites' body. ***The name tag has never been subjected to DNA testing.***

Likewise, the bulk of Ms. Stites' clothing – her pants, underpants, shoes, socks, work shirt, brassiere and a tee shirt found nearby – were likely handled by her killer and contain "touch" DNA. These items also have not been DNA tested (other than testing of small semen stains on portions of the underpants, discussed *infra*).

Law enforcement made a number of egregious mistakes in investigating Ms. Stites' murder. Although Ms. Stites' fiancé Fennell (a local police officer), was the leading suspect for many months, the police inexplicably failed to search the

2

couple's apartment. After quickly gathering several items from Fennell's truck, the police returned the truck to Fennell. He sold it almost immediately. None of the items gathered from the truck were ever DNA tested, including a cigarette lighter that the killer probably handled, as the body of Ms. Stites, a non-smoker, bore a fresh cigarette burn.

Law enforcement placed plastic bags over the victim's hands to capture and preserve any fingernail scrapings, and a condom was also collected. Again, none of these items were subjected to DNA testing.

\* \* \*

There were no eyewitnesses to Ms. Stites' murder, and the State presented no physical evidence – no fingerprints, footprints, hair, clothing fibers or other evidence – placing Mr. Reed at either the abandoned truck or where Ms. Stites' body was found. Instead, the State presented trace amounts of Reed's DNA detected on swabs taken from the body to establish that he and Stites had had sex, and an inference – now discredited as junk science by the State's own chief witness, medical examiner Dr. Bayardo – that estimated Ms. Stites' time of death as shortly after sex. Based on the foregoing, the State argued that Mr. Reed kidnapped, raped and murdered Stites.

Scientific evidence developed in Mr. Reed's post-conviction proceedings conclusively disproves the State's timelines that formed the foundation of its entire

3

theory of the case.  Such evidence demonstrates that Reed and Ms. Stites had sex at least a day before her death, and that their sex was consensual, gutting the State's theory of the case.

* * *

The District Court considered Mr. Reed's Chapter 64 motion at the one-day evidentiary Hearing.  At the Hearing, Mr. Reed presented unrebutted expert testimony conclusively establishing that DNA was left on the belt, name tag, and other items sought to be tested, and that the chain of custody as to each was satisfied.

At the conclusion of the Hearing, the District Court denied the motion in a one-sentence ruling from the bench:

> [T]he Court finds that this motion was filed untimely and calls for unreasonable delay, that there's no reasonable probability the defendant would not have been convicted had the results been available at the trial of the case.

R.R. Vol. 4 p. 227.  The Court's bench ruling made no mention of the testimony of *any* of the witnesses who testified, and did not follow the statutory standard for DNA testing – the statute contains no timeliness requirement, only that the motion not be filed for the *purpose* of unreasonably delaying execution of judgment.

The State thereafter submitted *ex parte* extensive proposed findings and conclusions which contained *no* citations to the record or governing legal standards.  The District Court adopted those findings and conclusions verbatim

4

(typographical errors included) without providing Mr. Reed any opportunity to comment.[2]

---

[2] The American Bar Association's Texas Capital Punishment Assessment Team has criticized Texas district courts' practice of the "adoption of one party's proposed findings of fact and conclusions of law verbatim" as "out of step with the overwhelming majority of capital punishment states in the United States." ABA, *Evaluating Fairness and Accuracy in State Death Penalty Systems: The Texas Capital Punishment Assessment Report* at xiii (Sept. 2013), *available at* www.americanbar.org/content/dam/aba/administrative/death_ penalty_moratorium/tx_complete_report.authcheckdam.pdf. The ABA has urged Texas to "[r]equire the district court to draft independent findings of fact and conclusions of law in each case." *Id.* at xiv. *See* App. 4.

## II.
## SUMMARY OF ARGUMENT

The District Court's denial of Mr. Reed's Chapter 64 motion reflects two key errors. *First*, the District Court wrongly concluded that Mr. Reed failed to meet his burden to show that exculpatory DNA evidence probably could have resulted in his acquittal at trial. Mr. Reed presented unrebutted expert testimony that the killer's DNA is present on the belt pieces, name tag, and clothing found on and near Ms. Stites' body. Pursuant to Article 64.03(a)(2)(A) of the Texas Code of Criminal Procedure, the District Court was required to – but did not – presume that DNA testing of these items would show exculpatory results, *i.e.*, that someone other than Mr. Reed handled the belt used to strangle Ms. Stites, her clothing and her name tag. The District Court should have considered whether, in light of this significant exculpatory evidence, the jury would nonetheless have convicted Mr. Reed of Ms. Stites' murder, when the State's evidence showed only that they had had sex, which was in fact consensual. The District Court's conclusion on this point is clearly wrong and should be reversed.

*Second*, the District Court erroneously adopted the State's proposed findings that Mr. Reed's purpose in seeking Chapter 64 relief was to unreasonably delay the execution of his sentence and the administration of justice. In its bench ruling, the District Court applied the wrong standard with respect to delay and made no

6

findings regarding Mr. Reed's purpose in filing the motion, noting only that it was "filed untimely and calls for unreasonable delay[.]"

Mr. Reed's initial post-conviction request for DNA testing was made 15 years ago, in 1999, two years before Chapter 64 was enacted. Mr. Reed subsequently sought testing by consent of the State through a letter sent in January 2014, three months before the State even filed a motion to schedule his execution. After months of negotiations, the State *finally* agreed in part to some DNA testing limited generally to the rape kit items known to contain Mr. Reed's semen and hairs from which he was already microscopically excluded. That agreed order was not finally obtained until a hearing in July 2014, when the State also obtained an execution date. Mr. Reed's Chapter 64 motion was filed at this time, still seven months before his currently-scheduled execution date.

In reaching its findings related to delay, the District Court also ignored the fact that substantial delays in Mr. Reed's post-conviction proceedings (including the DNA motion itself) resulted from *the State's* numerous requests for filing extensions and postponements to accommodate vacation and other scheduling issues. Instead, the District Court accepted wholesale the findings proposed by the State, including the incredible finding that *Mr. Reed's* Chapter 64 motion was intended to unreasonably delay his own as-yet-unscheduled execution, because one of Reed's attorneys had previously filed a Chapter 64 motion on behalf of a

7

different convicted person in an entirely unrelated capital case. The District Court's conclusion and findings on this point are in conflict with the record and well-established case law and should be reversed.

Moreover, the State's *ex parte* findings (adopted by the District Court) omitted **all** findings regarding the chain of custody and whether the evidence at issue contained biological material that can be tested for DNA, presumably because Mr. Reed satisfied those elements. Indeed, *the State did not even contest* chain of custody as to evidence in the possession of two of the three custodians (the Attorney General's Office and the Department of Public Safety Crime Lab). With respect to the third custodian, the State's witnesses testified that evidence held by the Bastrop County Clerk had been handled without gloves at the trial by jurors and court personnel, but Reed's experts established that chain of custody was nonetheless complete, *and* that such handling did not preclude probative DNA testing. None of these facts appear in the Findings and Conclusions.

Accordingly, and as further demonstrated below, the Court should reverse the District Court's decision and direct that the belt used to murder Ms. Stites, and the other evidence identified by Mr. Reed that was likely handled by her killer, be subjected to DNA testing.

**III.**
**STATEMENT OF FACTS**

**A.      Background**

Mr. Reed has already presented dispositive scientific evidence of his actual

innocence in a recently filed application for writ of habeas corpus. *See* Application

for Writ of Habeas Corpus, Cause No. WR-50,961-07 (Tex. Crim. App.), filed

February 13, 2015 ("Application for Writ of Habeas Corpus"). App. 5. And even

before this new evidence was developed, serious questions remained regarding the

identity of Ms. Stites' killer, the validity of the scientific evidence used to convict

Mr. Reed, and his actual innocence of the crime. Indeed, in deciding a prior

matter, this Court noted the facts give rise to "a *healthy suspicion* that Fennell had

some involvement in Stacey's death." *Ex parte Reed*, 271 S.W.3d 698, 747 (Tex.

Crim. App. 2008) (emphasis added). And, as Mr. Reed established through

unrebutted expert testimony, the murder weapon and a considerable amount of

other physical evidence that was handled by the killer can now be DNA tested to

exonerate Reed and potentially identify the killer's DNA profile.

**1.      The Murder Of Stacey Stites.**

On April 23, 1996, Ms. Stites missed her predawn shift at a Bastrop grocery

store. Her mother was called, who then alerted Fennell and police. Ms. Stites'

body was found that afternoon near an unpaved road outside Bastrop.

Before Ms. Stites was reported missing, a Bastrop police officer observed Ms. Stites' fiancé's truck in the Bastrop High School parking lot; nearby lay crumpled papers and a broken piece of belt. App. 6.[3] The school is approximately ten miles from where Ms. Stites' body was found. App. 7.

Texas Department of Public Safety ("DPS") Crime Laboratory investigators discovered numerous items at or near the body scene, including a second piece of belt similar to that found near Fennell's truck, an injury to Ms. Stites's neck consistent with the belt, and two beer cans. Karen Blakely, a DPS analyst, examined the body and swabs and tape lifts to recover trace evidence; presumptive tests indicated semen. App. 7. Stites' employee name tag was found placed on her leg on the outside of her pants, which had a broken zipper. R.R. Vol. 2 at 44. Both pieces of the belt, the name tag, and most items located at the body scene or in and around Fennell's truck have *never been tested for DNA evidence*.

## 2. The Investigation.

Fennell was for months the primary suspect in Ms. Stites' killing, even though the semen found was not his. App. 8. On two occasions, Fennell failed polygraph tests asking whether he strangled, hit or struck Stites.[4] App. 8, 9.

---

[3]    Documents at App. 6-16 are excerpts of the Reporter's Record of the trial phase in Cause No. 8701, *State of Texas v. Reed*, Bastrop County, Texas, 21st Judicial District.

[4]    Fennell underwent exams in October and December 1996. Both examiners reported that Fennell deceptively answered questions like "did you strangle Stacey Stites," "did you see her on the morning of April 23," and "did you strike Stacey Stites." App. 13.

10

During police questioning Fennell repeatedly invoked his Fifth Amendment rights. App. 14.

At Mr. Reed's trial, the State contended it was "logistically impossible" for Fennel to be guilty because he could not have left his truck in Bastrop around 5:00 a.m. and traveled 30 miles back to his apartment in Giddings, Texas by 6:45 a.m., where Stites's mother called him. App. 9, 14. The State inexplicably ignored the possibility that Fennell obtained a ride back to Giddings from associates that appear to have been investigated by the Bastrop Sheriff. *See* Application for Writ of Habeas Corpus at 25-27, App. 5 (discussing investigation of Curtis Davis and David Hall).

Mr. Reed was never investigated as a suspect in Ms. Stites' murder until he was implicated in an unrelated criminal investigation and his DNA was compared with that taken from Stites.

### 3. The State's Unsupported Scientific Evidence Results In Mr. Reed's Conviction.

Law enforcement conducted some DNA testing during their investigation, focusing on the swabs taken from Ms. Stites' body. They found three of Mr. Reed's intact sperm on a slide taken from Ms. Stites' vaginal cavity. The State then developed a theory of Mr. Reed's guilt premised on a scientific fallacy: that sperm remain intact in the body for no more than 24 hours after sex. The State contended that finding only a few intact sperm on a swab collected on the evening of April

11

23rd proved that Mr. Reed raped Ms. Stites at or near the time of her murder. App. 16. This false conclusion was bolstered by the medical examiner's testimony that Ms. Stites had been anally raped contemporaneous with her death. *Id.* at 45-46. App. 16. The State also argued that Mr. Reed's DNA collected from Ms. Stites' breast was saliva from *recent* sexual contact, based solely upon Fennell's uncorroborated testimony that Ms. Stites showered the previous day (App. 16) (arguing "normal people take showers and wash things off of them. [A rape] happened that morning."). The murder weapon (the belt used to strangle Ms. Stites) *was never tested for DNA*.

Mr. Reed's trial counsel did not call a forensic pathologist, criminalist or serologist, but relied only on a DNA analyst who did not substantively disagree with the results of the State's limited DNA testing. The jury therefore was given no alternative to the false impression created by the State's putative forensic evidence, and critically, was deprived of the knowledge of whose DNA appeared on the belt used to strangle Ms. Stites, her name tag and clothing, and other evidence touched by her killer.

Mr. Reed was convicted of capital murder following a trial presided over by the Hon. Harold R. Towslee and sentenced to death by judgment dated May 29, 1998. The Court of Criminal Appeals affirmed on December 6, 2000. *Reed v. State*, No. AP-73,135 (Tex. Crim. App. Dec. 6, 2000).

**B.     Mr. Reed's Post-Conviction Proceedings**

While Mr. Reed's direct appeal was pending, appointed counsel filed his initial state habeas application.  Petition for Writ of Habeas Corpus, Cause No. WR-50, 961-01 (Tex. Crim. App.)   After the State attached a previously undisclosed exculpatory DNA report to its response, Mr. Reed supplemented his claim and received a limited evidentiary hearing.  *Ex parte Reed*, 271 S.W.3d at 739.   Reed raised a *Brady* claim relating to the State's mid-trial suppression of an exculpatory DNA report from testing of a beer can found near Ms. Stites' body.  The results showed that three people – Ms. Stites; Ed Salmela, a Bastrop police officer;[5] and David Hall, a Giddings police officer (and close friend and neighbor of Fennell) – all were potential matches to the DNA on the beer can.  Additional DNA analysis was done regarding the beer can DNA.

In March 1999, during Mr. Reed's state habeas proceedings, he filed a motion seeking DNA testing of the belt used as a ligature and the white tee shirt found near Ms. Stites' body.  App. 1.  The motion argued that DNA testing was necessary to develop Mr. Reed's habeas claims of actual innocence and ineffective assistance of trial counsel.  *Id.* at 2.  The motion was supported by an affidavit of DNA expert Elizabeth A. Johnson, Ph.D., Mr. Reed's DNA expert at trial.  Dr.

---

[5]    Officer Salmela died a few months after Stites was killed from a gunshot wound to the head. His death was determined to be a suicide, despite the fact no testing was conducted to see whether his hands showed gunpowder residue.  Mr. Reed moved for such testing but the motion apparently was never ruled upon. *See* App. 24.

13

Johnson testified that the belt "was not thoroughly examined for the presence of blood, tissue or skin cells that might be present if the belt were used, as believed, to strangle the victim, Stacy Stites." She further stated that "blood, tissue or skin cells foreign to the victim, if found, could indicate the identity of the perpetrator." App. 1, Ex. A ¶ 8. Dr. Johnson also testified that the tee shirt, which had been stored at the State's lab facility, had not been tested for saliva, and that she was unable during the trial to conduct such testing there. App. 1, Ex. A ¶ 11. The District Court denied Mr. Reed's testing motion. App. 3.

Thereafter, the District Court adopted the State's proposed findings of fact and conclusions of law and recommended that this Court deny relief on Mr. Reed's state habeas petition. On appeal, this Court then adopted Judge Towslee's decision and determined that Mr. Reed's supplemental claim was procedurally defaulted. *See Ex parte Reed*, No. WR-50,961-01 (Tex. Crim. App. Feb. 13, 2002).

Mr. Reed then commenced a federal habeas proceeding with new counsel. New counsel uncovered additional exculpatory evidence and, as required, obtained a stay of the federal court proceedings so that the new claims could be first presented to the state court in a habeas application, which was filed March 29, 2005.[6] In this application, Mr. Reed presented claims based on new forensic

---

[6] Under established federal habeas law, claims based upon exculpatory evidence discovered post-conviction must generally be presented to the state courts before they may be pursued in federal court. *See* 28 U.S.C. § 2254(b)(1)(A).

14

evidence which supported his contention that he had a relationship with Ms. Stites and that the two had sex over a day before her death. Reed also raised claims that the State suppressed exculpatory evidence, including:

- An eyewitness who saw Fennell and Stites arguing by the side of the road on the morning of her death;

- An eyewitness placing Stites in a car on the outskirts of Bastrop with unidentified men the night before she disappeared, at the time when Fennell claimed she was at home and asleep;

- A statement from a police officer who said that Fennell bragged that if he caught his girlfriend cheating, he would strangle her with a belt; and

- Multiple complaints and lawsuits against Fennell alleging racism and physical abuse while on duty as a police officer.

This Court remanded two *Brady* claims for an evidentiary hearing, and found Mr. Reed's remaining claims to be procedurally defaulted. *Ex parte Reed*, No. WR-50,961-03, 2005 WL 2659440 (Tex. Crim. App. Oct. 19, 2005) (mem. op., not designated for publication). The hearing was conducted by the Hon. Reva Towslee Corbett, the daughter of the trial judge who oversaw Mr. Reed's trial.[7] After a hearing, Judge Corbett adopted verbatim the State's proposed findings of fact and conclusions of law, following which Mr. Reed appealed. During the

---

[7]   Both judges were also involved in the trial and habeas proceedings of Anthony Graves, who was later found innocent and released from death row. Allegations of improper judicial conduct by this father/daughter team are well-known. *See* Lisa Faulkenberg, *Maybe Judge Is Just Dad's Girl*, Houston Chronicle, Feb.16, 2011, http://www.chron.com/news /falkenberg/article/Falkenberg-Maybe-judge-is-just-dad-s-girl-1685509.php). Judge Corbett has since recused herself from further proceedings. App. 17.

15

appeal, Mr. Reed filed additional state habeas applications raising Fennell's rape conviction and recently filed corruption charges against Bastrop County Sheriff Richard Hernandez. This Court denied relief. *Ex parte Reed*, 271 S.W.3d 698 (Tex. Crim. App. 2008); *Ex parte Reed*, No. WR-50,961-04, -05 (Tex. Crim. App. Jan. 14, 2009); *Ex parte Reed*, No. WR 50,961-06 (Tex. Crim. App. July 1, 2009).

Mr. Reed thereafter filed in federal court his Second Amended Petition (the "Petition"), which restarted his abated federal proceeding. Mr. Reed's federal habeas proceedings were substantially delayed – in total, by more than *six months* – due to the State's repeated extension requests. For example, during these proceedings, the State obtained three extensions of time totaling 62 days.[8] Mr. Reed's habeas petition was eventually denied, and the denial later affirmed by the Fifth Circuit. *See Reed v. Stephens*, 739 F.3d 753, 790 (5th Cir. 2014). During the Fifth Circuit proceedings, the State requested and received three more extensions of briefing deadlines, totaling 71 days.[9] Thereafter, Mr. Reed sought a writ of

---

[8]     *See* Unopposed Motion To Extend Time To File Responsive Pleading To Petition filed April 4, 2003 (Docket No. 42); Order On Motion entered April 8, 2003 (Docket No. 43) (granting State a 60-day extension to respond to habeas petition); *see also* Order Granting Motion To Extend Time entered April 28, 2003 (Docket No. 50) (granting State extension to respond to discovery motion). (*Reed v. Thaler*, C.A. No. 02-cv-142, W.D. Tex.). App. 18.

[9]     *See* Phone Extension Confirmed entered on August 5, 2013 (granting 30 day extension to file appellee's brief); Unopposed Motion to Extend Time to File Respondent-Appellee's Brief filed on September 3, 2013 and Order on Motion entered September 4, 2014 (granting additional 31 day extension to file appellee's brief); Unopposed Motion for Extension of Time to File a Response to Petitioner-Appellee's Petition for Rehearing En Banc and Order on Motion entered February 27, 2014 (granting 10 day extension to file response) in *Reed v. Stephens*, No. 13-70009 (5th Cir. 2013). App. 19.

16

certiorari from the United States Supreme Court. During the Supreme Court briefing, the State twice requested and received additional time to respond, for a total of 60 additional days.[10] The Supreme Court denied Mr. Reed's certiorari petition on November 3, 2014. By that time, the State had obtained more than six months' of extensions in Reed's federal habeas proceedings alone.

### 1.    New Scientific Evidence Eviscerates The State's Theory Of Reed's Guilt.

Since the trial, the State's key forensic witness – Robert Bayardo, M.D.— has retracted his opinion offered at trial and now contradicts the State's scientific proof that Mr. Reed sexually assaulted Ms. Stites. (C.R. 119-122) In addition, three of the most experienced and well-regarded forensic pathologists in the country – Michael Baden, Werner Spitz and LeRoy Riddick – all reevaluated the case and determined that Mr. Reed's guilt is ***medically and scientifically impossible***. These three nationally renowned experts unanimously agree that (1) Reed did not sexually assault Stites and (2) she was killed much earlier that the 3 a.m. estimate relied upon by the State at trial. App. 5 at 3, 37-48. Indeed, these three individuals, who have more than 100 years of combined expertise, all agree that Stites was murdered before midnight on April 22, 1996 and kept in a face-

---

[10]    *See* Order extending time to file response to petition to and including August 20, 2014, entered July 21, 2014 (granting 30 day extension); *See also* Order further extending time to file response to petition to and including September 19, 2014, entered August 19, 2014 (granting additional 30 day extension) in *Reed v. Stephens,* No. 13-1509 (U.S.). App. 20.

down position for 4-6 hours before she was transported in Fennell's truck and dragged into the brush where she was discovered lying on her back on the afternoon of April 23, 1996.

Dr. Werner Spitz explained that the observable forensic evidence including "lividity, rigor, the amount of residual sperm in the genital tract, and evidence of decomposition" rendered the State's theory of the case "medically and scientifically impossible". App 5 at 3. Spitz stated that when all those factors were considered together, "it becomes indisputable that the time of death was considerably earlier than 3:00 a.m. on April 23[rd]", the timing required for the State's theory of the crime to hold true. *Id.* He states instead that "[a]ll findings point to a post mortem interval 20-24 hours prior to the time the body was filmed." *Id.* The State's forensic crime scene examiner was filmed manipulating the body between 7-8 p.m on April 23rd. Thus, the latest Ms. Stites could have been killed was just before midnight on April 22nd, during the time when Fennell – now the only possible suspect – claims he was home with Ms. Stites.

2. **New And Mounting Evidence Corroborates Prior Testimony of Reed and Stites' Relationship And Reveals Fennell As An Abuser Of Police Power And A Serial Rapist Who Stated He Would Kills Ms. Stites If She Were Unfaithful By Strangling Her With A Belt.**

In addition to the scientific and motive evidence discussed above, more evidence implicating Fennell in Ms. Stites' murder has emerged since Mr. Reed's

18

conviction. This evidence undermines Fennell's uncorroborated alibi that he was home asleep when Ms. Stites was murdered, reveals Fennell as a serial rapist and an unabashed abuser of police power, and provides a disturbingly prophetic account of Fennell discussing how he would kill an unfaithful girlfriend. Constitutional claims based upon much of this evidence have been to date rejected, but there is no question that mounting evidence raises serious doubts about Reed's guilt that could well be resolved through DNA testing before his life is extinguished.

New credible witnesses have come forward to corroborate the fact that Reed had a consensual relationship with Ms. Stites. Alicia Slater, a co-worker of Stites at the H.E.B., state that Stites confided in her that she was "not excited about getting married . . . [and] that she was sleeping with a black guy named Mr. Reed and that she didn't know what her fiancé would do if he found out." App. 5 at 5, 55-56. And, Lee Roy Ybarra, another H.E.B. employee, attested to the relationship between Reed and Stites. App. 5 at 57. He stated that when Reed came into the store, Stites' "demeanor would change" and she was "happy to seek him and would be in a good mood." App. 5 at 56. In contrast, when Fennell entered the store, "she would become a nervous wreck . . . there were times Ms. Stites would deliberately hide so that she didn't have to talk to him." App. 5 at 57.

19

In addition to these two witnesses, there is further evidence that Fennell publicly stated he would gravely harm Ms. Stites if he discovered that she had been unfaithful. A police academy classmate of Fennell's, Sergeant Mary Blackwell, who witnessed Fennell yelling at Ms. Stites, testified that Fennell said he would kill Ms. Stites with a belt if he discovered she had been unfaithful:

> He said, "If I ever find my girlfriend cheating on me, I'll strangle her." I told him that if he did that he would be caught because he would leave fingerprints. Jimmy then said, "That just goes to show you'll never know shit; I won't leave any prints because I'll use a belt."

*Ex parte Reed*, 271 S.W.3d at 719, 724.

Fennell wasted no time in mourning Ms. Stites, and began dating again shortly after her death. His next girlfriend described him as abusive, possessive, controlling, and extremely prejudiced toward African–Americans. After the woman ended her relationship with Fennell, he relentlessly stalked her at home and work, and further abused his police authority to harass men she dated. *Id*. at 745-46.

Evidence further implicating Fennell has emerged, in addition to that which this Court has already acknowledged "may indeed arouse a healthy suspicion that Fennell had some involvement in Stacey's death." *Ex parte Reed*, 271 S.W.3d at 747. Fennell was accused of kidnapping and raping two different woman within

20

the span of one week and while he was on duty.[11]  Shortly thereafter, three more

women reported that Fennell abused his power as a peace officer to sexually harass

and terrorize them.[12]  Fennell is presently in prison for sexually assaulting a

women he took into police custody, and is now nearing the end of his 10-year

sentence.  *Ex parte Reed*, Nos. WR-50,961-04, WR-50,961-05, 2009 WL 97260, at

*3-4 (Tex. Crim. App. Jan. 14, 2009). *See also* App. 21.

## C.    Mr. Reed's DNA Testing Requests And Motion.

### 1.    The State's stalling tactics concerning Mr. Reed's DNA testing requests.

On January 13, 2014, Mr. Reed's counsel wrote to the Bastrop County

District Attorney requesting the State's agreement for DNA testing through a

transparent and collaborative process.  *See* C.R. 108-117 (Letter to Bryan Goertz

requesting agreed DNA testing).  Reed's letter explained that the State would incur

no costs from the testing, and that all test results would be shared with the State

---

[11]   See Indictment, *State v. Fennell*, No. 07-1752-K368 (368th Dist. Ct., Williamson County, Dec. 4, 2007) (victim reported that Fennell kidnapped her following a domestic disturbance call, drove her to a secluded location and raped her); Police Report attached as exhibit to *Ex parte Reed*, No. WR-50,961-04 (victim reported Fennell strip-searched her in front of other male officers, drove her to a park and raped her.

[12]   *See* Police Report attached as exhibit to *Ex Parte Reed*, No. WR-50,961-04 (victim reported that Fennell isolated her from her family following a traffic stop, threatened her, and told her he would come to her home later and expected her husband to be away and her children asleep); *See* Police Report attached as exhibit to *Ex Parte Reed*, No. WR-50,961-04 (victim reported Fennell threatened her by claiming she could have her children taken from her he "could bend her over the couch and 'fuck' her"); Police Report attached as exhibit to *Ex parte Reed*, No. WR-50,961-04 (reporting that Fennell threatened to send a woman to jail and returned later to ask her personal questions about her dating interests and social activities).

21

when released. *Id.* The Bastrop County District Attorney, Bryan Goertz, agreed that DNA testing "should take place in the interests of justice," but referred the matter to the Attorney General's Office.[13] *See* Aff. Of Bryce Benjet ¶ 3, Ex. 1 to Reed's Opposition to State's Motion for Accelerated Appeal filed in this case on Jan. 30, 2015 (herein "Benjet Aff.").

Although the State's initial position was encouraging, negotiations with the State dragged on for more than five months until the State finally arrived at a decision regarding what it would agree to test. Within about two months of Mr. Reed's January 2014 letter, the majority of the evidence which Reed sought to test was either in the Attorney General's possession or had been inventoried by the State in the ensuing month. *See* C.R. 214 (inventory dated 2/14/14 of evidence held at Bastrop County Clerk's Office). Discussions with the Attorney General's Office nonetheless proceeded slowly.

On April 8, 2014, the State filed a motion to set Reed's execution date, while still delaying resolution of Mr. Reed's long-pending DNA testing request. C.R. 34-35. Mr. Reed's counsel then proposed a stipulated interim order to allow for testing of items which the State agreed to test, while the State continued to consider the remainder. *See* Benjet Aff. ¶ 4. This, too, met with a tardy response. At the end of April, 2014, the Attorney General advised that any agreed DNA

---

[13] At the time Mr. Reed's letter was sent, he was seeking a rehearing before the Fifth Circuit. The State did not move to set an execution date, for another three months.

testing would be extremely limited, and continued to defer a decision regarding the evidence to be tested on a consensual basis. Benjet Aff. ¶ 5. The Assistant Attorney General insisted that all final decisions on the agreed testing be deferred until his supervisor returned from a lengthy vacation.

The supervisor's return from vacation did not abate the State's delays. Two more months passed before the Attorney General approved the form of stipulated testing order and permitted it to be presented to the District Court. *See* July 14, 2014 Agreed Order, C.R. 144-48. The State insisted that Mr. Reed's execution date be set at the same time, and the District Court acquiesced. C.R. 149-50.

**2.      Mr. Reed files his DNA testing motion after the State rejects the majority of his testing requests.**

Once it became clear that the State would not agree to any meaningful DNA testing, Mr. Reed's counsel prepared a DNA motion, which was filed on the same day. C.R. 74-143. Belying any suggestion of urgency, the State took the full 60-day response period to file its opposition, even though the State had already advised that it would oppose all further evidence testing. C.R. 161. Mr. Reed's counsel sought a prompt hearing on the DNA testing motion in early October, but no hearing took place until late November 2014, because the State asked to delay the hearing to accommodate another personnel vacation by its staff. Benjet Aff. ¶ 6.

### (a)     Mr. Reed's DNA Motion Was Supported By Two Affidavits.

Mr. Reed's DNA motion argued that the belt that was used to strangle Ms. Stites, her clothing and name tag, and other pieces of evidence collected from her body, the truck and death scene, should be tested for DNA evidence deposited by the killer during the strangulation.

In support of his motion, Mr. Reed submitted an affidavit[14] from a DNA testing expert, Deanna D. Lankford, M.T. (ASCP), the Associate Laboratory Director at Cellmark Forensics in Dallas, Texas.  C.R. 243-54.  Cellmark is an accredited laboratory that specializes in forensic DNA testing.  C.R. 244, ¶ 2.  Ms. Lankford explained that, because of advances in DNA testing technology, Cellmark could now obtain new and relevant information from evidence gathered in the investigation of Stites' murder.

> Modern DNA technology is considerably more sensitive and sophisticated than the testing available in 1998 when Mr. Reed's trial took place and in 2001 when additional DNA testing was performed. Current DNA technology can develop full or partial genetic profiles where DNA methods in use in 2001 and earlier could not.  Current DNA technology is sensitive enough to identify an individual's unique DNA profile from a microscopic amount of biological material previously undetected using older methods.  Current technology is also designed to develop DNA profiles from poorly preserved or decades-old degraded samples that were unsuitable for testing using the testing techniques available over a decade ago.  Likewise, advancements in DNA technology have allowed us to obtain genetic

---

[14]     The Clerk's Record contains multiple copies of Lankford's affidavit.  Citations herein are to the first copy only.

profiles despite the presence of chemicals that in the past would inhibit the DNA amplification process.

C.R. 245-46, ¶ 9. In particular, Lankford stated that DNA testing methods such as Y-STR, Mini-STR and mitochondrial DNA analysis could provide new information if used on the evidence that was gathered in the 1996 murder investigation, and that these methods were not previously available or used on the evidence that Reed sought to have tested. C.R. 246-47, ¶ 10-13.

Moreover, Lankford stated that, to a reasonable degree of scientific certainty, biological material *is* present on the items Reed seeks to test, because every time someone comes into contact with another human, place, or thing, physical material (trace evidence) is exchanged. C.R. 247, ¶¶ 15-16. She also attested to her certainty regarding the existence of biological material on the evidence Reed seeks to have tested by her review of crime lab and police reports, and photographs of the evidence. C.R. 247, ¶ 15. Ms. Lankford further attested that these items were either in close and extended contact with a ready source of biological material, or had been forcefully repeatedly handled by a person (the perpetrator) whose shed epithelial cells can be detected and the DNA thereon analyzed. C.R. 248, ¶ 18.

Mr. Reed also filed his own sworn affidavit as required by statute (C.R. 317-18). In this affidavit, Mr. Reed explains the presence of his DNA on the samples taken from Stites's body. He and Ms. Stites met in October or November 1995 and

25

carried on an occasional, mostly clandestine relationship, because both were dating other people. C.R. 317, ¶¶ 2-5. Less than a month before Ms. Stites' murder, Fennell discovered Reed's relationship with Stites; Fennell confronted Reed and threatened him, saying that Reed "was going to pay." C.R. 318, ¶ 6.[15] Upon hearing of the threat, Ms. Stites told Reed that if Fennell caught them, he would kill her. *Id.* Mr. Reed stated that the last time he saw Ms. Stites was very late Sunday, April 21 or very early Monday April 22, and that he and Ms. Stites had sex in Bastrop State Park. C.R. 318, ¶ 7. Mr. Reed further attested that when he heard of Ms. Stites' death, he became afraid that if he told the police of his relationship with Ms. Stites and Fennell's threats, he would become a suspect or Fennell would retaliate. C.R. 318, ¶ 8. For that same reason, Mr. Reed denied knowing Ms. Stites when he was arrested on a drug charge a year later. *Id.*

### (b)  Mr. Reed Put Forth Unrebutted Testimony At The Evidentiary Hearing On His DNA Motion.

The District Court held an evidentiary hearing on Reed's DNA Motion on November 25, 2014. At the Hearing, Reed put forth two witnesses, John Paolucci, a former police detective and an expert in crime scene investigation, and Ms. Lankford. (R.R. Vol. 2 at 12-13, 88) Both Mr. Paolucci and Ms. Lankford

---

[15]  This harrowing account is corroborated by the affidavit of Chris Aldredge that was filed in prior proceedings as well as a note in the investigative files of the Bastrop County District Attorney's Office that indicates a practice in which Jimmy Fennell would ridge along with Curtis Davis in his patrol car. See Application for Writ of Habeas Corpus at 30, n.18 (statement of Carol Stites). App. 5.

testified that the evidence that Mr. Reed sought to have tested could and should be tested for DNA to provide evidence of Reed's innocence.

Mr. Paolucci testified that DNA evidence located upon on the belt pieces and other items that the killer touched could reveal the perpetrator's identify and exculpate Mr. Reed. R.R. Vol. 2 at 17-18. Ms. Lankford testified that any item that had been touched has DNA on it. R.R. Vol. 3 at 135. The State did not introduce *any* evidence to refute the expert testimony provided by these two witnesses. R.R. Vol. 4 at 208. Reed's hearing evidence is summarized below.

### (c) Items On Ms. Stites' Body.

Photos of Ms. Stites' body show that she was wearing jeans, underwear, socks, bra and a left shoe. R.R. Vol. 2 at 29-38. Her H.E.B. name tag was carefully placed in the crook of her knee. (R.R. Vol. 5, Def. Ex. 5)

The chart below summarizes the testimony regarding the items located on Stites' body, and the basis for DNA testing of each:

| DESCRIPTION | CUSTODIAN | SUMMARY OF TESTIMONY |
|---|---|---|
| Victim's pants | Bastrop County Clerk | Karen Blakely testified that Stites' pants were pulled off in a violent manner. "this zipper here is broken. It's unzipped, her pants are parted but this zipper is actually broken and there is a tooth from the zipper actually pulled off, it's missing." App. 7. She also testified that Stites had post mortem scratches to one side of her body. App. 7.<br><br>Wilson Young, the State's forensic serologist noted that he observed stains on Stites' pants. |

27

| DESCRIPTION | CUSTODIAN | SUMMARY OF TESTIMONY |
|---|---|---|
| | | At the time, he testified that he believe that they were not of evidentiary value, so they were not tested for DNA. App. 12.<br><br>Paolucci testified that the perpetrator may have pulled her pants off or redressed her. "In order to drag the victim to the location where she was found, there would have to be a lot of skin cell evidence deposited on the cuffs of the pants or maybe the waistband of the pants to – to move her. As well as the button closure . . . . That's an area where there's going to be some pressure and it's a non-porous substrate and skin cells would be scraped off on the button. I think that would be a good – good area to test." R.R. Vol. 2 at 29-30. |
| Victim's underwear | Bastrop County Clerk | Ms. Blakely testified at trial that Stites' underwear were loose and "baggy". App. 7. Only a stain from the crotch area was tested at trial. App. 12.<br><br>Paolucci testified that DNA could be collected from the victim's underwear because "if the perpetrator grabbed the waistband inside the panties, he could be depositing epithelial cells there." R.R. Vol. 2 at 33. |
| Two socks | Bastrop County Clerk | Paolucci testified that the socks found on the victim could contain relevant DNA evidence of the killer, "if the victim was dressed, there's going to be skin cells on the socks. Also, the movement of the vehicle, a sneaker was removed that could – the socks could have been held when the victim's being dragged; so that would be a significant area for – to test for epithelial cells." Paolucci stated that the "upper cuff of the sock that had been pulled on |

| DESCRIPTION | CUSTODIAN | SUMMARY OF TESTIMONY |
|---|---|---|
| | | and off" should be tested for DNA evidence. R.R. Vol. 2 at 34-35. |
| Left shoe | Bastrop County Clerk | Blakely noted at trial that the crime scene investigators noted that it was significant that she was partially undressed and wearing only one shoe.  App. 7.<br><br>Paolucci testified that the left shoe, which was found tied to the body, should be tested for DNA from the perpetrator, "I would test the heel, which would be a convenient area to grab to – to move the victim, the – the toe area of the shoe if the victim's dressed and also the laces."  Paolucci stated that these areas should be tested because it appears the victim was dragged.  R.R. Vol. 2 at 35-37. |
| Bra | Bastrop County Clerk | Blakely testified at trial that Stites' shirtless body was carried at least part of the way to the crime scene.  App. 7.<br><br>Paolucci testified that the bra should be tested for DNA evidence because "that could also have – have been used to handle the victim, to move the victim.  If the victim had been dressed, the clasp on the bra is another one of those non-porous substrates that would be able to scrape epithelial cells off the person handling it."  R.R. Vol. 2 at 37. |
| Employee name tag | Bastrop County Clerk | Blakely testified at trial that it was "very significant" to the crime scene investigators that the HEB name tag was placed in the "crook" of Stites' knee.   App. 7.<br><br>Paolucci stated that the HEB tag found placed on Stites' leg "[b]ecause that would be something that's at the scene where the body was found.  It's the – if the perpetrator handled |

29

| DESCRIPTION | CUSTODIAN | SUMMARY OF TESTIMONY |
|---|---|---|
| | | it, he would have deposited DNA on it; and so I consider that highly probative [sic] piece of evidence."  R.R. Vol. 2 at 44. |
| Plastic bags placed over victim's hands during investigation | Attorney General | Paolucci stated that these bags should be tested because "[i]n a struggle, the – the victim could have scratched the perpetrator and got skin cells on her hands, on her fingernails, which I understand were very short; that could then be transferred to the bag."  R.R. Vol. 2 at 53-54. |

### (d)    Items Found At Crime Scene.

Law enforcement collected but did not DNA test a number of items from the scene where Stites' body was found, including a white tee shirt, two beer cans and a section of woven belt.  At trial, Ms. Blakely testified that the white tee shirt was held by someone, and crumpled up to wipe away dirt.  App. 7.  Also at trial, the section of woven belt was determined to be part of the murder weapon.  App. 11.  Moreover, at trial, it was determined that the belt had been torn, not cut, indicating that the murderer handled the belt with his hands.  App. 10.  As stated at page 13, *infra*, the two beer cans found on the roadside near the scene were previously swabbed and tested for DNA using less precise methods than currently available.  The results of those tests conclusively excluded Mr. Reed, but Ms. Stites, Officer Salmela, and Officer Hall (a close friend and neighbor of Fennell), all were potential matches to the DNA on the beer can.  There is no reason for Salmela or Hall to have been present at the scene when Ms. Stites' body was found.  A

condom collected and turned over to police likewise was never tested for DNA of the victim or the killer.

Paolucci testified at the Hearing that the following items contained DNA evidence of the likely perpetrator and should be tested:

| DESCRIPTION | CUSTODIAN | SUMMARY OF TESTIMONY |
|---|---|---|
| White t-shirt | Bastrop County Clerk | Blakely testified that the t-shirt had been held and "crinkled." App. 7.<br><br>Paolucci testified that the t-shirt found in the brush near the victim's body should be tested for DNA of both Stites and the perpetrator. "I would test it in the areas that – like the collar, some areas that would be likely to identify the wearer so we can say that this is part of this crime scene; and then I would test it for areas where it could have been removed and handled by a perpetrator." R.R. Vol. 2 at 38. |
| Section of belt (no buckle) | Bastrop County Clerk | Blakeley testified that "on the road, leading towards the crime scene was a link of webbed belt" that was significant "because it matched the pattern that was on the victim's neck." App. 7.<br><br>Paolucci testified that the belt should be tested "[b]ecause of the corresponding marks to the victim's throat, it would be apparent that the perpetrator handled it and with some degree of force which would cause a rubbing action and a heavy deposit of epithelial cells on the belt." R.R. Vol. 2 at 39. |
| Two Busch beer cans | Attorney General | Paolucci testified that the beer cans were "highly probative evidence" because they were found at the scene "where the victim was found." Paolucci stated he would test "the lip around the opening . . . where the person consuming the beer would be placing their |

31

| | | lips, and I would also perform latent print development on the – on the cans – on the bite of each can" and that he would also test the cans for epithelial cells.  R.R. Vol. 2 at 46-47. |
|---|---|---|
| Swabs/samples taken from mouths of two Busch beer cans | DPS Crime Lab | Paolucci stated that these samples should be tested for same reasons as the cans themselves, which are highly probative. R.R. Vol. 2 at 55. |
| Used condom | Attorney General | Paolucci testifies that the condom, which was recovered by a resident near the crime scene and brought to investigators and taken into evidence, should be tested.  "I would recommend testing the outside of the condom because now you would know if this is related to this incident.  If it has the victim's DNA on it, then we can say this is related to this incident."  R.R. Vol. 2 at 53. |
| Extract samples from blue condom stored in coin envelope | DPS Crime Lab | Paolucci testified that these samples should be tested for the same reasons as the condom itself.  R.R. Vol. 2 at 54-55. |

### (e)    Items Found Near And Inside Fennell's Truck.

Several items found near or around Fennell's truck were likely touched by Ms. Stites' killer, but were never DNA tested, including another section of the belt used to strangle Ms. Stites.  Mr. Paolucci testified that the belt and other items noted below were observed by crime scene investigators as being out of place and could have been used in the commission of the crime, and are likely to have the perpetrator's DNA on them.  Paolucci's unrebutted testimony established that the items found near and inside Fennell's truck should be tested for the perpetrator's DNA, as follows:

32

| ITEM DESCRIPTION | CUSTODIAN | SUMMARY OF TESTIMONY |
|---|---|---|
| Section of belt with buckle | Bastrop County Clerk | Paolucci testified that DNA evidence collected from this section of the belt should be collected and tested because the killer touched the belt since it was the murder weapon. "The belt was broken; so, being that it's also consistent with the – with the other portion of the belt, which is consistent with the marks on the victim's throat, that would have had a significant force applied to break that belt; and also the buckle is a non-porous substrate suitable for DNA." R.R. Vol. 2 at 43. |
| HEB pen | Attorney General | Trial testimony indicated that the HEB pen was located next to the section of belt found at the truck scene. App. 15.<br><br>Paolucci stated that the HEB pen that crime scene investigators found on the ground near the truck should be tested because "it can be tied back to the vehicle, and it was also handled at some point either recklessly being knocked out of the vehicle or – or dropped." R.R. Vol. 2 at 48-49. |
| Right shoe | Bastrop County Clerk | Paolucci testified that portions of Stites" right shoe should be tested – the heel, toe and laces areas." "If [the shoe] has been removed from the victim and untied so the laces in those same areas would be probative." R.R. Vol. 2 at 39-40. |
| Earring | Bastrop County Clerk | Paolucci stated that the earring found in Fennell's truck should be tested because "[b]eing that the backing was found in the victim's hair, it's safe to assume that she was wearing the – an earring at the time; and if that earring's ripped out during the struggle, then it could have the perpetrator's DNA on it." R.R. Vol. 2 at 40. |
| HEB employee | Bastrop | Paolucci testified that Stites' work shirt, which |

33

| | | |
|---|---|---|
| shirt | County Clerk | was found in the back of Fennell's truck should be tested for DNA because "[i]f it was removed from her during an assault, then it would have the perpetrator's epithelial cells." Paolucci also suggests testing the collar area, the cuffs of the sleeves and the armpit areas of the shirt. R.R. Vol. 2 at 41. |
| Knife and metal cover | Bastrop County Clerk | Paolucci testified that the knife and metal cover found in Fennell's truck should be tested for the killer's DNA because "the victim's knife, if it's something that she would wear on her belt, the belt was removed; so if the knife is – is on the belt, it's also going to be handled by the perpetrator." R.R. Vol. 2 at 41-42. |
| Pieces of plastic cup | Bastrop County Clerk | Paolucci states that the shattered plastic cup found in Fennell's truck should be tested because "there was a portion of that cup in the driver's seat. It could be that that was broken during the event and then the – it was handled and pushed into the door pocket by the perpetrator." R.R. Vol. 2 at 42. |
| Brown planner/organizer | Bastrop County Clerk | Paolucci testified that the planner/organizer should be tested for the killer's DNA because it was found in between the passenger and the driver's seat in the cab of the truck. "That was in an area that would have been close to the perpetrator and the operator of the vehicle." R.R. Vol. 2 at 44-45. |
| Single hair removed from organizer/planner | Attorney General | Paolucci stated that the hair found in the brown planner should be tested because it could belong to the perpetrator. R.R. Vol. 2 at 50. |
| Green lighter | Attorney General | Paolucci recommends testing the lighter found in the truck because no cigarette butts were found in the truck, making it possible that the lighter could have been introduced by the perpetrator. R.R. Vol. 2 at 51-52. |
| Metal box cutter | Attorney General | Paolucci testified that the box cutter could have been handled by the perpetrator. R.R. Vol. 2 at 52. |

34

| | | |
|---|---|---|
| Pack of Big Red gum | Attorney General | Paolucci testified that the gum pack could have been handled by the perpetrator. R.R. Vol. 2 at 52. |

**(f)    The State's Evidence Does Not Contradict Reed's Evidence.**

The State put forth *no* evidence to rebut Mr. Reed's expert testimony that the items Mr. Reed seeks to test contain biological evidence suitable for DNA testing, or regarding the effect of potentially exculpatory DNA results.  Nor did the State contest chain of custody for the items within the possession of the Attorney General's Office and the Department of Public Safety Crime Lab.  Instead, the State's three witnesses testified solely about the chain of custody of several items in the custody of the Bastrop County Clerk's Office.  The State's witnesses were: Gerald Clough, an investigator for the Attorney General's Office; Etta Wiley, a criminal deputy clerk for the Bastrop County Clerk's Office; and Lisa Tanner, an assistant attorney general and the prosecutor at Mr. Reed's trial.  R.R. Vol. 4 at 176, 190, 196.

With respect to items located at the office of the Bastrop County Clerk, Etta Wiley, Criminal Deputy Clerk, testified that her job is to ensure the integrity of the evidence; she confirmed that the evidence from Mr. Reed's case was kept locked at all times.  R.R. Vol. 4 at 195:9-196:19.  Ms. Wiley further confirmed that she had

35

no cause to believe any of the evidence items had been materially altered, tampered with, substituted, or replaced. *Id*. at 196:9-19.

Ms. Tanner, one of the prosecutors in Mr. Reed's case, testified that items had been handled at trial without gloves. R.R. Vol. 4 at 199:1-200:8. And Mr. Clough, an investigator for the Attorney General's Office, believed the clerk's office improperly stored the evidence. R.R. Vol. 4 at 184:5-10. However, neither Tanner nor Clough rebutted (nor were they qualified to rebut) Ms. Lankford's expert testimony that such treatment did not preclude effective DNA testing or destroy potentially exculpatory DNA information. R.R. Vol. 3 at 96:13-101:19; C.R. 288-290.

At the conclusion of the Hearing, the District Court denied the motion with a cursory bench ruling that stated, in its entirety:

> All right. After reviewing all the documents that were presented, those in court today, and all the evidence and arguments of counsel, the Court finds that this motion was filed untimely and calls for unreasonable delay, that there's no reasonable probability the defendant would not have been convicted had the results been available at the trial of the case. Your motion is denied.

R.R. Vol. 4 at 227:4-11. The District Court's cursory one-sentence ruling thus included no findings involving credibility or motive determinations, nor any comment upon the evidence presented during the day-long Hearing.

On December 12, 2014, the District Court entered Findings of Fact and Conclusions of Law drafted entirely by the State, which were submitted to the

36

court *ex parte* and which contained no citations to the record. Notably, the State's draft – which was adopted by the court verbatim, including a typographical error incorrectly reciting one of the statutory elements – contains *thirteen* paragraphs regarding Mr. Reed's purported "delay" in filing the DNA Motion.[16] Most of these "findings" regarding delay were not based on any evidence presented at the Hearing. Moreover, the State's draft contained no findings regarding the unrebutted expert testimony Mr. Reed presented at the hearing regarding the suitability of the evidence at issue to DNA testing, the likelihood that presumptively favorable testing results would have resulted in Mr. Reed's acquittal, the chain of custody, Reed's extensive efforts to reach an agreement for consensual DNA testing before filing his motion, or the delays occasioned by the State's repeated extensions of deadlines and briefing schedules. The District Court made no changes to the State's proposed findings before signing it.

The State did not rebut any of the testimony put forth by Mr. Reed at the DNA Motion hearing regarding the probative nature of the items Reed seeks to have tested. Nonetheless, the Findings of Facts adopted by the District Court stated that the exculpatory results of the requested DNA testing would be undermined because some unspecified items were handled by court personnel, certain individuals in the Attorney General's office and jurors. (C.R. 347-348, ¶

---

[16] Given the sheer brevity of the District Court's bench ruling, the level of detail contained in the state-prepared findings is remarkable.

37

24c) These findings are unsupported; the State presented no scientific expert testimony to refute the testimony of Mr. Reed's well-qualified experts that that effective DNA testing was possible, and that such items *would not* lose their probative value despite having been touched subsequent to their being taken into evidence.

## IV.
## ARGUMENT

**A.    Legal Standards and Standard of Review.**

### 1.    Chapter 64 Requirements.

Under Chapter 64, a convicted person may seek DNA testing of any "biological evidence that may be suitable for DNA testing" including "blood, semen, hair, saliva, skin tissue or cells, fingernail scrapings, bone, or bodily fluids." *See* Tex. Crim. Proc. Code Ann. art. 64.01(a)(1) (West Supp. 2014). Such evidence must have been secured in relation to the challenged offense, in the State's possession at trial, and either not previously DNA-tested or capable of being tested with newer techniques that may yield "more accurate and probative" results. *Id.* at art. 64.01(b). DNA testing is mandatory if:

1.    the evidence "exists in a condition making DNA testing possible" and "has been subjected to a chain of custody" sufficient to show that it has not been substituted, tampered with, replaced, or materially altered;

2.    identity was an issue at trial;

38

3.     the movant more than likely "would not have been convicted if exculpatory [DNA] results had been obtained"; and

4.     the request for DNA testing is probably "not made to unreasonably delay the execution of sentence or administration of justice."

*Id*. at art. 64.03(a)(1), (2) (West Supp. 2014).

There is no burden of proof regarding the evidence's chain of custody, testable condition, and whether identity was at issue; rather, the court must simply make findings on these questions. *Cf. Prystash v. State*, 3 S.W.3d 522, 535 (Tex. Crim. App. 1999) (en banc) (no burden of proof on mitigation special issue in capital cases). The movant bears the burden to prove by a preponderance of the evidence (i.e. 51%) that favorable DNA results could have prevented his conviction, and his lack of intent to cause unreasonable delay. *See Routier v. State*, 273 S.W.3d 241, 257 (Tex. Crim. App. 2008). However, the movant does not have to show that the test results are actually exculpatory; to the contrary, exculpatory test results (including the identification of a known alternate suspect as the source of the DNA, and the possibility of finding redundant DNA profiles on separate items of evidence) must be presumed. *See In re Morton*, 326 S.W.3d 634, 641 (Tex. App.—Austin 2010, no pet.). The Court must consider all possible exculpatory results, including identification of a known offender through

39

comparison of a DNA profile to the CODIS database. *See Routier*, 273 S.W.3d at 259; *see also* Tex. Crim. Proc. Code Ann. art. 64.035 (West Supp. 2014).[17]

## 2. Bifurcated Standard Of Review On Appeal.

Appellate review of an order granting or denying Chapter 64 relief is governed by a bifurcated standard of review. Findings of historical fact, credibility and demeanor are entitled to substantial deference on appeal, but all other issues, including the ultimate question of whether the disposition below was correct, are reviewed *de novo. Green v. State*, 100 S.W.3d 344, 344 (Tex. App. —San Antonio 2002, pet. ref'd) (citing *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002)).

In *Smith v. State*, this Court made clear that when a trial court makes findings on a Chapter 64 motion without a hearing, and such findings are based upon the record of the movant's underlying criminal trial and affidavits, such findings do not involve assessments of the credibility and demeanor of live witnesses, and, therefore, are not entitled to deference on appeal:

> While we defer to the trial court's determination of issues of historical fact and application of law to fact issues that turn on the credibility and demeanor of the witnesses, there were no such issues in this case since there were no witnesses at the hearing and the trial record and affidavit of Appellant are the only sources of information supporting the motion. As a result, the trial court is in no better position and we will review the issues *de novo*.

---

[17] As this Court has acknowledged, the 2011 amendments to Chapter 64, including the new requirement to compare DNA results to the CODIS database, warrant a reexamination of prior interpretations of the statute. *See Holberg v. State*, 425 S.W.3d 282, 286 n.24 (Tex. Crim. App. 2014).

*Smith v. State,* 165 S.W.3d 361, 363 (Tex. Crim. App. 2005); *see also Campos v. State*, No. 01-14-00167-CR, 2014 WL 7204966, at *2 (Tex. App.—Houston, Dec. 18, 2014, no pet.) (mem. op., not designated for publication). Although the District Court conducted a hearing in this case, nearly all of the court's findings concerning whether Mr. Reed intended to cause unreasonable delay and whether exculpatory test results might have prevented his conviction were expressly derived from the underlying record of Reed's criminal trial and post-conviction proceedings. C.R. at 344-48, ¶¶ 23-24c. *None* of these 18 numbered paragraphs in the Findings and Conclusions are based upon the testimony of any of the five witnesses who testified at the Hearing. Accordingly, the *de novo* standard of review applies.

**B.**     **The District Court Wrongly Conclude**d **That Mr. Reed Failed To Prove That Exculpatory DNA Test Results Likely Would Have Resulted In His Acquittal**. **(Issue 1).**

At the conclusion of the Hearing, the District Court ruled that "that there's no reasonable probability the defendant would not have been convicted had the results been available at the trial of the case." R.R. Vol. 4 at 227:8-11. The court's one-line verbal conclusion contains *no* findings of fact, identifies *no* relevant evidence, and reflects a fundamental misunderstanding and misapplication of the statutory test.

41

The State's subsequent proposed written Findings and Conclusions, which the District Court adopted *in toto,* included more details.  C.R. 342-348.  The written Findings and Conclusions include an "umbrella" finding, C.R. 347, ¶ 24, stating that Mr. Reed "failed to prove by a preponderance of the evidence that he would not have been convicted but for exculpatory results from DNA testing" and several subsidiary paragraphs of findings.  C.R. 347-48, ¶¶ 24a-24c.

The District Court's written Findings and Conclusions continue to misapply the applicable standard, in at least two critical ways. First, the District Court incorrectly weighed the "strength" of the State's case against Mr. Reed.  It adopted and assumed the correctness of the State's theory at trial that Ms. Stites was killed shortly after having sex with Reed, as shown by the "intactness" of three of Reed's sperm found in her body, because human sperm ostensibly remain intact in such conditions for no more than 24 hours.  However, the court failed to consider the possibility that DNA testing would prove that this trial theory was incorrect. Experts, including Dr. Bayardo, the State's own chief expert at trial, all now agree that the State's "intactness" timing theory is wrong because, as a matter of established science, human sperm can remain intact for several days in such conditions.  These sworn expert statements were included in Mr. Reed's testing motion but ignored by the District Court.  C.R. 118-142.  The District Court's

42

written findings on these and related points are simply wrong, contradicted by the record, and should be reversed.

Second, the District Court erred by applying an improperly narrowed definition of "exculpatory result" which ignored the unique power of forensic DNA testing to actually identify the person whose biological material is detected and instead considered only a scenario in which Reed was excluded as the source of individual samples of biological material. The District Court failed to apply the required statutory presumption that DNA testing of the belt, name tag, victim's clothing and other specified items of evidence at issue would show the presence of the DNA of an alternative known suspect, and the absence of Mr. Reed's DNA, on each item. *See Routier*, 273 S.W.3d at 257 (statute requires court to assume DNA testing of evidence at issue will yield exculpatory results, and then evaluate "whether there is a greater than 50% chance that the appellant's jury would not have convicted her had it been aware of those presumptively favorable test results"). This error of law is reviewed *de novo* and should be reversed.

Instead of following *Routier*, the District Court accepted the State's crafted "futility" test. The court concluded that because the jury was aware that Mr. Reed's "genetic profile" did not match three identified items of evidence, testing *any* of the evidence at issue could not exculpate him. This is the wrong test. Moreover, the District Court simply ignored the fact that the vast majority of the

43

evidence Reed seeks to test is evidence which was handled by the perpetrator and, like the belt and the name tag, but never subjected to DNA testing. DNA test results showing Reed's absence from such items, and the repeat presence of a third party, are more than likely to have resulted in Reed's acquittal.

**1.     The State's Case Against Mr. Reed Was Highly Circumstantial, Based Upon Now-Debunked Junk Science And Tenuous Inferences, And Did Not Constitute A "Mountain Of Evidence" By Any Measure.**

The District Court accepted the State's characterization that its "case on guilt/innocence was strong." C.R. 347 ¶ 24a. As an initial matter, the "strength" of the State's evidence is relevant to the weighing of the exculpatory value to be attributed to DNA test results showing the presence of a third party's DNA at the crime scenes. The presence of a "mountain" of evidence supporting guilt can reduce the exculpatory significance of third party DNA. *State v. Swearingen*, 424 S.W.3d 32, 38 (Tex. Crim. App. 2014) (observing that exculpatory value of third-party DNA at crime scene would not overcome "mountain of evidence" against defendant and denying testing); *Qadir v. State*, No. 02–13–00308–C.R., 2014 WL 1389545, at *4-5 (Tex.App.—Fort Worth Apr. 10, 2014, no. pet.) (mem. op., not designated for publication) (rejecting possibility of exculpatory effects of possible presence of third party DNA at crime scene where "substantial evidence" supported conviction).

On the other hand, when the State's case on guilt is not compelling (i.e., less than overwhelming), the presence of a third party's DNA at the crime scene may be sufficiently exculpatory as to justify DNA testing. *See Fain v. State*, 2014 WL 6840282, at *6 (Tex.App.—Fort Worth 2014, pet. filed) (mem. op., not designated for publication) (reversing district court and ordering DNA testing of items that could show presence of third party at crime scene where "evidence of Appellant's guilt was far from overwhelming"); *Routier*, 273 S.W.3d at 259 (because "the State's theory [of movant's guilt was] hardly unassailable[,]" presence of third party DNA at crime scene would support movant's intruder theory and "could readily have tipped the jury's verdict in the appellant's favor[;]" vacating denial of testing motion).

As demonstrated below, the District Court's conclusion that the State had a "strong" case against Mr. Reed was premised upon findings that are questionable and, in some instances, flatly wrong. The applicable standard of review is *de novo*. *See State v. Rivera*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002); *see also Routier,* 273 S.W. 3d at 257; *Smith*, 165 S.W.3d at 363. The District Court's findings on these points are thus entitled to no deference and, because they are wrong or highly questionable, should be reversed.[18] *See Routier*, 273 S.W.3d at 259-260. As a

---

[18]  Paragraph 24a of the District Court's Findings and Conclusions states as follows:

The State's case on guilt-innocence was strong – Movant's DNA was found both on and inside the victim, which demonstrated presence; the intactness of Movant's sperm inside the

result, the District Court should have considered that DNA test results that demonstrate the presence of third party DNA at the crime scenes as sufficiently exculpatory evidence as to support an acquittal at trial, justifying DNA testing in this case. *See Fain*, 2014 WL 6840282, at \*7*; Routier*, 273 S.W.3d at 259*; Esparza v. State,* 282 S.W. 3d 913, 921-22 (Tex. Crim. App. 2009).

## 2. The Circumstantial Evidence Cited By The District Court Does Not Support Its Findings.

The District Court found that the State's case against Mr. Reed was "strong" partly based on two items of highly suspect circumstantial evidence: (i) the fact that Reed "matched the height of someone who would have fit the adjusted seat in the victim's truck" (C.R. 347, ¶ 24a); and (ii) the finding that "Movant frequented the area of the victim's disappearance at the time the victim disappeared." The court's characterization of these findings as "strong" evidence of Reed's guilt is unwarranted and both ignores and mischaracterizes contrary record evidence.

First, there is no evidence supporting the reliability of the State's "seat adjustment/mirror test" of height. The record is silent as to whether Fennell, could

victim's vaginal cavity, the perimortem injuries to the victim's anus, Movant's saliva on the victim's breasts after she took a shower the evening before her murder, and the small amount of semen in the victim's panties demonstrated sexual assault contemporaneous with murder; the peri-mortem injury to the victim's anus the obvious signs of sexual assault – the victim's bunched up panties, a broken pants zipper, partially unclothed, bruises to the arms, torso and head of the victim – demonstrated lack of consent; and additional evidence indicated that Movant frequented the area of the victim's disappearance at the time the victim disappeared and the Movant matched the height of someone who would have fit the adjusted seat in the victim's truck. C.R. 367, ¶ 24a.

have seen through the mirror or if differences in posture could have affected visibility through the mirror. And even were this Court to entertain the absurd notion of resting a capital murder conviction on speculation arising from the adjustment of a seat and rear view mirror, *three* of Fennell's friends and fellow police officers – David Hall, Ed Salmela, and Curtis Davis – were each at least six feet tall.[19] C.R. 318; App. 22. Two of these persons – Hall and Salmela – were likely present at Bluebonnet Road where Stites' body was dumped, according to DNA tests conducted on a beer can found near her body. *See supra* at 12.[20] By contrast, ***no*** evidence was found that Reed was at that location (or anywhere near the truck).[21] Plainly, the seat positioning in Fennell's truck is just as consistent with the corroborated presence of Fennell's cohort David Hall as it is with the uncorroborated presence of Reed, and is therefore far from "strong" evidence of Reed's guilt.

Second, no witnesses testified as to the location where Stites actually "disappeared" or to having seen Reed at such time. All the State showed at trial

---

[19] See Petition for Writ of Habeas Corpus, p. 10 in *Ex Parte Reed*, WR-50, 961-04 (Tex. Crim. App. 2003)

[20] The presence of Officers Hall and Salmela on Bluebonnet Road at the time Stite's body was dumped could explain how Fennell returned to his apartment the morning Stites was reported missing. It could also indicate that Hall and Salmela dumped the body without Fennell, avoiding any need for Fennell to rush back to his apartment.

[21] No physical evidence of any kind established Mr. Reed's presence in the truck or at the Bluebonnet Road site – no eyewitness saw him, and no fingerprints, palm prints, DNA, clothing, fibers, or other evidence from Mr. Reed were found at either location.

47

was that Stites commuted 30 miles to work on occasion via a route that passed through Reed's Bastrop neighborhood (along with hundreds of other people) where he was known to walk. App. 16. However, new scientific evidence presented in Reed's recently filed habeas application demonstrates that Ms. Stites was murdered hours before she would have left Giddings to go to work. This, too, is far from "strong" evidence of guilt.

### 3. The District Court's Finding Regarding "Presence" Is Ambiguous And Should Either Be Clarified Or Reversed.

The District Court's finding of Mr. Reed's "presence" (based upon DNA taken from Ms. Stites' body) is ambiguous. "Presence" may have been intended to mean that Mr. Reed had sexual contact with Ms. Stites at an unspecified prior point in time. If that is what the court meant, this finding is not disputed.

If, however, the District Court intended "presence" to mean that Mr. Reed was present *at one of the crime scenes at the time of Ms. Stites' death*, the finding is clearly wrongful and should be reversed. The record of Mr. Reed's case is replete with sworn expert declarations adduced during Mr. Reed's habeas proceedings conclusively demonstrating that the State's timing theory is not correct because sperm can remain intact in a woman's vagina for three days or more after sex.[22]

---

[22] The District Court's Findings and Conclusions state that they are based upon consideration of "the record in this [Mr. Reed's] case." C.R. 342. Consideration of the trial and post-conviction record is permitted under the doctrine of judicial notice. *Routier v. State*, 273 S.W.3d 241, 244 n.2 (Tex. Crim. App. 2008). As in the *Routier* case, District Judge Doug Shaver was not the judge that presided over Mr. Reed's trial, and his reference to

48

C.R. 119-42  Indeed, even the State's own chief witness on this point at trial, medical examiner Dr. Roberto Bayardo, agrees.  In his sworn habeas declaration, Dr. Bayardo disavows the theory that the time of Stites' death was at or shortly after the time when she and Reed had sex.  C.R. 120.  And, as noted above, no physical evidence of any kind placed Mr. Reed at either crime scene at any point in time.  The District Court's finding of "presence" thus is utterly ambiguous and should be reversed or at least clarified to state that Mr. Reed had sexual contact with Ms. Stites at an unspecified point in time before her death.  In either case, the finding does not constitute "strong" evidence against Mr. Reed.

> **4.** **The District Court's Finding Regarding Time Of Death Was Based Upon Unreliable Testimony That Has Either Been (i) Debunked By The Prosecution's Own Witness And Other Experts, Or (ii) Was Given Solely By Jimmy Fennell, Who Was Strongly Incentivized To Lie To Avoid Prosecution**.

The District Court found "strong" evidence that Mr. Reed was physically present with Ms. Stites at the time of her death based in part upon "the intactness of Movant's sperm inside the victim's vaginal cavity" and semen found in her panties.  C.R. 347, ¶ 24a.  For the same reasons described in the preceding section, the

---

consideration of "the record" necessarily reflects judicial notice. *Id.*  Such consideration is further consistent with Chapter 64's requirements that a movant seeking DNA testing provide affidavits alleging facts in support and that the movant establish by a preponderance that favorable DNA test results likely would have resulted in an acquittal. *See* Tex. Code Crim. Proc. arts. 64.01(a-1) *and* 64-03(a)(2)(A).  Had the Legislature intended to confine judicial consideration of facts in support of Chapter 64 relief to the trial court record, it would have expressly done so.

49

State's contemporaneous timing theory is wrong as a matter of science, clearly erroneous, and should be reversed.

The District Court's "timing" finding was also based upon a separate temporal conclusion: that Mr. Reed's DNA, taken from saliva found on Ms. Stites' breast, was deposited *after* she had showered the evening before her death. (C.R. 347, ¶ 24a) The District Court ignored the unreliability of this evidence. The *only* evidence that Ms. Stites showered on April 22, 1996 – and, thus, the *only* evidence of the time when the saliva and DNA were deposited – was Jimmy Fennell's uncorroborated trial testimony. App. 8. As noted, Fennell was the lead suspect in Stites' murder for more than a year, the person with the greatest possible incentive to lie, and twice failed lie detector tests when asked by investigators about having harmed Stacey Stites.[23] *See* pp. 10-11, *supra*. These facts and others, as this Court previously observed, give rise to a "healthy suspicion" that Fennell, not Reed, was the perpetrator, and greatly undermine the District Court's weighing of this evidence. This Court's *de novo* review of the District Court's findings should therefore recognize these material infirmities in the State's evidence and reverse the District Court's conclusion that the State's evidence on timing issues was "strong." *Cf. Routier*, 273 S.W.3d at 259 (holding that the State's theory was "hardly unassailable" and that the State's circumstantial evidence was "not so compelling

---

[23] Not surprisingly, these facts are notably missing from the District Court's Findings and Conclusions.

that the jury would more likely conclude beyond a reasonable doubt" appellant's guilt); *Fain*, 2014 WL 6840282, at \*1, \*6 (discounting strength of state's case based upon "purchased and suspect" testimony of jailhouse informant with personal incentive to provide evidence of defendant's guilt and ordering DNA testing).

### 5. The District Court's Finding Of Stites' Apparent Lack Of Consent Does Not Implicate Mr. Reed.

The District Court also made a finding regarding the broken pants zipper, appearance of Stites' underwear, and bruises to her body, characterizing them as "strong" evidence that Stites did not consent to sex.  C.R. 347, ¶ 24a.  These findings are misleading, and are not evidence of Reed's guilt – no DNA, fingerprint, or other evidence established that *Reed* (as opposed to someone else) broke the zipper, pulled the underwear, or caused bruises.   There is no dispute that Ms. Stites did not consent to her strangulation or to the dragging of her body into the brush.  The bruises and condition of Stites' clothing are simply evidence of the murder.  Moreover, as Dr. Bayardo and other experts have stated under oath, there is no evidence that the sexual contact between Mr. Reed and Ms. Stites was non-consensual.  C.R. 121, ¶ 6, C.R. 127, ¶ 21.

Finally, the District Court's reliance on the condition of the pants and underwear highlight the critical need in this case to subject these items to DNA testing, precisely because (as the District Court implicitly recognized), the person

that killed Ms. Stites likely handled these items and left identifiable DNA on them. *See* pp. 27-35, *supra.* Absent such readily available and definitive DNA test results, it is clear error to characterize these items as "strong" evidence (or indeed as *any* evidence) of Mr. Reed's guilt.

For these reasons, this Court should reverse the District Court's finding that the State's case against Mr. Reed was "strong" and should hold that DNA test results which might show the presence of DNA at the crime scenes that does not belong to Mr. Reed is sufficiently exculpatory to justify DNA testing in this case.

### 6. The District Court Misapplied The Test For Determining Whether Mr. Reed Proved By A Preponderance Of The Evidence That Exculpatory DNA Test Results Likely Would Have Resulted In His Acquittal

Under established law, the District Court was required to engage in a two-step analysis to determine whether Mr. Reed had met his burden under Article 64.03(a)(1)(B) and (2)(A) to show that exculpatory DNA test results could have changed the outcome at his trial.[24] First, the court must presume that DNA testing will yield favorable (i.e., exculpatory) results, and cannot weigh the likelihood that favorable results will in fact be obtained if testing is authorized. *See In re Morton*, 326 S.W.3d 634, 641 (Tex. App.—Austin 2010, no pet.); *Routier*, 273 S.W.3d at

---

[24] Approximately 50% of all DNA exonerations result in the identification of the real perpetrator. *See* Innocence Project, Know the Cases, http://www.innocenceproject.org/know/ (last visited February 14, 2015). 52 of the 325 cases in which DNA testing has resulted in exoneration involved persons convicted in Texas, more than any other state. *Id.* App. 23. (follow "National View" hyperlink).

257. Second, the court must then consider whether such presumptively favorable results, if presented at trial, would have made it more likely than not (*i.e.,* greater than 50% likelihood) that a conviction would not have been obtained. *See id.*

### 7. The Statutory Presumption Of Exculpatory DNA Test Results.

As this Court recognized not long ago in *State v. Swearingen*, the text of Chapter 64 "does not set a standard for exculpatory results." 424 S.W.3d 32, 39 (Tex. Crim App. 2014). Cases from this Court and the Court of Appeals have developed standards as to the meaning of the phrase. In a leading decision under Chapter 64, *Blacklock v. State*, 235 S.W.3d 231 (Tex. Crim. App. 2007), this Court examined the nature of exculpatory results for which Chapter 64 testing should be granted. In *Blacklock*, the defendant had been convicted of aggravated robbery and aggravated sexual assault stemming from the same incident. The victim knew the defendant and identified him as her attacker. The State presented vaginal smear analysis to show that a sexual assault had occurred, but DNA testing of such evidence was inconclusive. Semen was also detected on the victim's clothing, but the clothes were not subjected to DNA testing. Years later, Blacklock later moved to DNA-test the clothing. This Court approved DNA testing and explained that DNA tests of the clothing that showed the semen donor was not Blacklock would be directly exculpatory, and that this was "precisely the situation

53

in which the Legislature intended to provide post-conviction DNA testing." 235 S.W.3d at 232-33.

*Blacklock* was a sexual assault case in which the defendant denied having sex with the victim; as a result, DNA results that proved the semen was not his would plainly exclude him as the perpetrator and, thus, be exculpatory. The Court was not asked to consider and did not address whether DNA evidence showing the presence of a third party at a crime scene could also be exculpatory.

In subsequent cases, courts have clarified that "exculpatory results" may include results that identify the presence of third party DNA at a crime scene as well as those which exclude the defendant. For example, in a subsequent sexual assault case, the Court permitted DNA testing of a rape kit and the victim's clothing despite eyewitness testimony identifying the defendant and circumstantial evidence. *Esparza v. State*, 282 S.W.3d at 921-22. The Court rejected the State's argument that DNA testing in that case showing the presence of third party DNA could not be exculpatory. *Id.* at 922.

In *Routier*, the State argued that exculpatory DNA results could not undermine the evidence of guilt presented at trial:

> The State argues that the presence of an unknown person's DNA could not have changed the jury's verdict because "it would not refute the evidence physically linking appellant to the murders and to the manipulation of the evidence at the scene. At a minimum, appellant would undoubtedly have been convicted as a party."

54

273 S.W.3d at 259. The Court rejected the State's argument, and held that DNA results implicating an unknown offender –intruder would corroborate the defendant's contention that someone else committed the murder and thereby create at least a 51% likelihood that the jury would not have convicted. *Id*.

In *Fain v. State*, the court reversed a decision denying testing where the evidence sought to be tested could show third party DNA at the crime scene. The *Fain* court observed that the state's evidence of guilt was "far from overwhelming," 2014 WL 6840282, at *6, and, further explained:

> Evidence that exculpates the innocent and ties the guilty to [the victim] at the time of her death cannot be held to merely "muddy the waters." If the contributor of the untested hair in [the victim's] hands is identified, for the first time in this case, we would know whether Nix, Appellant, or the unidentified male was with [the victim] at the time of her death when she pulled hairs from his head. Additionally, identifying DNA other than [the victim]'s in the blood on the bathroom faucet handle would be compelling evidence of the identity of the assailant, since the bleeding neck injury necessarily connects to [the victim]'s death.

*Id*. at *8. These cases thus make clear that in a case like this one, where the killer's identity is hotly contested, where there is no proverbial "mountain" of evidence establishing the defendant's guilt, and where a sizable number of evidence items were touched by the perpetrator but not tested, the court has much greater discretion to treat DNA test results that may identify those

physically present with the victim at the time of death as verdict-changing exculpatory evidence.[25]  *See id.*; *Routier*, 273 S.W.3d at 259-260.

It is also clear that the District Court was required to consider *all* exculpatory results, including the identification of a known alternate suspect, and the possibility of finding the same third party DNA on separate items of evidence (i.e., a "redundant" DNA profile). *See Routier*, 273 S.W.3d at 259.  Because Chapter 64 now requires that the results of court-ordered DNA testing be cross-referenced against state and federal DNA databases of known offenders, the possibility that the perpetrator could be identified through such database comparison as a known offender should also be considered.  *See* Tex. Crim. Proc. Code  Ann. art. 64.035 (West Supp. 2014) (amended in September 2011).[26]  The exculpatory ramifications of post-conviction DNA identification of a third party perpetrator are well-documented in Texas law, and should inform this Court's

---

[25]  *But see State v. Swearingen*, 424 S.W.3d 32, 38 (Tex. Crim. App. 2014) (noting in *dicta* that prior decisions have "held 'exculpatory results' to mean *only* results 'excluding [the convicted person] as the donor of this material'" (alteration in original) (emphasis added) (quoting *Blacklock v. State*, 235 S.W.3d 231, 232 (Tex. Crim. App. 2007)).  *Swearingen* relied upon the *Blacklock* decision for this proposition, but as noted above, the question of whether the presence of third party DNA at a crime scene could be viewed as exculpatory for Chapter 64 purposes was not presented in *Blacklock*.

[26]  This Court previously rejected a similar argument in *dicta* while acknowledging that the statute fails to set a standard for exculpatory results. *See Swearingen*, 424 S.W.3d at 39; *see also* n. 24*, supra*.  More recently, the Court has recognized the need to reexamine its prior interpretations of Chapter 64 in light of the 2011 amendments. *See Holberg v. State*, 425 S.W.3d 282, 286 n.24 (Tex. Crim. App. 2014) (noting without deciding that "this amendment to Article 64.01(a) [may] operate[] to lessen the burden on Chapter 64 movants to prove the existence of biological material within the items they seek to have tested").

consideration in this case. *See*, *e.g.*, *Ex parte Michael Morton*, No. AP-76663 (Tex. Crim. App. Oct. 12, 2011) (habeas relief granted where DNA results linked third party offender to crime); *Ex parte Phillips*, No. AP-76010, 2008 WL 4417288, at *1 (Tex. Crim. App. Oct. 1, 2008) (per curiam) (not designated for publication) (granting habeas relief after post-conviction DNA testing and investigation showed someone else committed at least one of the offenses of which defendant had been convicted); *Ex parte Giles*, No. AP-75712, 2007 WL 1776009, at *1 (Tex. Crim. App. June 20, 2007) (per curiam) (not designated for publication) (granting habeas relief in rape case where post-conviction DNA evidence and investigation indicated that someone other than defendant committed crime); *Ex parte Karage*, No. AP-75253, 2005 WL 2374440, at *1 (Tex. Crim. App. Sept. 28, 2005) (per curiam) (mem. op., not designated for publication) (granting habeas relief after semen and spermatozoa recovered from victim matched convicted offender in CODIS).

**8.    The District Court Failed To Apply The Required Presumption That DNA Test Results Would Be Exculpatory.**

Had the District Court correctly applied the statutory presumption of exculpatory DNA test results, it would have presumed that such testing would reveal the DNA of an alternative known suspect, and the absence of Mr. Reed's DNA, on the evidence Reed seeks to test (i.e., the belt used to strangle Ms. Stites,

57

the victim's name tag, her clothing, fingernail scrapings, and other evidence very likely handled by her killer). Acting properly, the District Court would have then asked whether the jury would likely have harbored a reasonable doubt as to Reed's guilt in light of (i) the total absence of any evidence placing Reed in the truck or at the Bluebonnet Road location, and (ii) the evidence showing that Reed and Stites had sex before her mother last saw her. *See Routier*, 273 S.W.3d at 259 ("We think that adding DNA evidence that would corroborate the appellant's account of an unknown intruder into the evidentiary mix could readily have tipped the jury's verdict in the appellant's favor."); *Fain*, 2014 WL 6840282, at *8 (holding that it would be unlikely for a jury to convict appellant if DNA tested "excluded Appellant as the donor"); *In re Morton*, 326 S.W.3d at 645 (finding a greater than 50% likelihood that jury would have had a reasonable doubt that movant was the murderer if a bandana contained victim's blood and DNA of another person).

The District Court misapplied the statute. It failed to consider or identify presumptively favorable DNA test results for *any* of these items of evidence, and consequently failed to evaluate whether Mr. Reed had shown a likelihood of not being convicted if such presumed results had been presented at trial. Instead, the court substituted its own flawed "futility" analysis, assuming – without any citation to the underlying trial record – that the jury had been made aware that Mr. Reed's "genetic profile" was not found on three specified items (certain hairs and

58

fingerprints, *see* C.R. 347 ¶ 24b), and, inferentially, that DNA testing of these or any other items could yield no further exculpatory results of value.

The District Court's substitute test was artificially constrained, and did not conform to the well-established test articulated in this Court's jurisprudence. The court's conclusion should therefore be reversed. *See Routier*, 273 S.W.3d at 259.

First, the court did not consider the exculpatory ramifications of the body of evidence which Mr. Reed seeks to test as a whole. The jury was informed by the State that Ms. Stites was strangled to death with the belt, and that her name tag was placed upon her body after it was dressed and dragged. Had the jury been informed that Reed's DNA was not present on *any* of those items – and to be clear, the jury was *not* so informed – Reed 's showing that the jury likely would not have convicted him probably would have been sufficient. The court should have considered together the likely effect on the jury of favorable DNA results from the belt, name tag, victim's clothing and other items of evidence that Reed seeks to test.

Further, because the State's case was not "strong," as discussed *infra*, the court should also have considered the effect on conviction if the jury had been advised that a redundant DNA profile of a third party (either a known alternate suspect, such as Fennell, Hall or Salmela, or another person) was found repeatedly on items that were handled by her killer. *Cf.* R.R. Vol. 2 at 74-75; *Fain*, 2014 WL

59

6840282 at *8; *Routier*, 273 S.W.3d at 259.  Even as to the three specified items which the court did consider, it failed to consider the effect on the jury had those items yielded a consistent redundant DNA profile of a known alternative suspect, such as Fennell, Hall, or Salmela.  The presence of any of their respective DNA on the three items in question – especially Hall, whose presence at the body location was corroborated (but not explained) by his DNA taken from the beer can – would persuasively support Reed's claim of innocence.

Moreover, there is no question that the jury did *not* hear testimony that Mr. Reed's DNA was absent from those materials; including, but not limited to, the belt, the name tag, the victim's clothing, and the beer cans.  The court's contrary conclusion in Paragraph 24b that "the jury knew that many of the items Movant seeks to test were not from him" is simply wrong as a matter of fact and should be reversed.  It is also unclear what the District Court's reference to Mr. Reed's "genetic profile" was intended to convey.  If the court intended the phrase to refer to Reed's DNA, the finding is clearly erroneous, as it is undisputed that these items were not DNA-tested.

C.     **The District Court's Conclusion That This Motion Was Brought For The Purposes Of Delay Is Not Correct  (Issue 2).**

Mr. Reed presented evidence and argument to meet his statutory burden under Article 64.03(a)(2)(B) to show that he did not intend to cause unreasonable delay in the execution of sentence or administration of justice. *Despite having*

*agreed to conduct some DNA testing of evidence*, the State nonetheless devoted the vast majority of its briefing and oral argument to this issue. The District Court found that Mr. Reed "failed to prove by a preponderance of the evidence that his Chapter 64 motion is not made to unreasonably delay the execution of sentence of [sic] administration of justice."[27] C.R. 344, ¶ 23. This umbrella finding was followed by 13 individual subsidiary paragraphs listing the grounds upon which the court's finding was based. C.R. 344-47, ¶¶ 23a-m. In fact, all but three of the findings of fact centered around Reed's purported delay in filing the DNA Motion. *Id*. As set forth below, the District Court's conclusion and subsidiary findings on this issue are entitled to no deference on appeal, are plainly wrong, and should be reversed.

---

[27] The statute's text provides "execution of sentence *or* administration of justice." Tex. Crim. Proc. Code Ann. art. 64.03(a)(2)(B) (West Supp. 2014) (emphasis added). The typographical error noted was contained in the State's *ex parte* draft findings and conclusions, which the District Court adopted without change. The problems resulting from a trial court's verbatim adoption of one party's findings are well documented. *See Anderson v. City of Bessemer*, 470 U.S. 564, 572 (1985) (criticizing "verbatim adoption" of proposed findings, particularly "conclusory statements unsupported by citation to the record," noting the "potential for overreaching and exaggeration" by the prevailing party, and evaluating whether judge "uncritically accepted findings" entirely); *In re Luhr Brothers*, 157 F.3d 333, 338 (5th Cir. 1998) (noting that "near-verbatim recitals of the . . . proposed party's proposed findings . . ., with minimal revision" should be approached with "'caution'" (citation omitted)); *Marine Shale Processors, Inc. v. U.S. Envt'l Prot. Agency*, 81 F.3d 1371, 1386 (5th Cir. 1996) (discouraging practice of wholesale adoption of findings and conclusions: "[w]e tolerate the occasional use of this device because of our trust that district courts will closely examine the proposed findings and will carefully consider the objections and arguments of the opposing party").

### 1. The Standard Of Review.

The standard of review of the District Court's Findings and Conclusions regarding whether Mr. Reed intended to cause unreasonable delay under Article 64.03(a)(2)(B) is either the substantial deference standard or the *de novo* standard, depending on whether the court's findings and conclusions were based upon historic facts, determinations of the subjective credibility and motive of witnesses (in which case the substantial deference standard applies), or upon facts that are neither "historic" nor dependent upon the credibility or motive of witnesses (subject to *de novo* review). *See Skinner v. State*, 122 S.W.3d 808, 811 (Tex. Crim. App. 2003). Here, the District Court's findings concerning Mr. Reed's ostensible intent to cause unreasonable delay were not based upon the credibility or motive of Mr. Reed, any testifying witness or any historical facts relating to Ms. Stites' murder. Instead, the court's findings all constitute inferences which the court drew in error from its interpretation of the record of Mr. Reed's post-conviction proceedings and the record in an entirely separate, unrelated action involving another death row inmate, Larry Swearingen, who is also represented by one of Reed's attorneys. The District Court's findings on this issue are therefore subject to the *de novo* standard. *See Smith v. State,* 165 S.W.3d 361, 363 (Tex. Crim. App. 2005) (because trial court is no better suited to interpret record than appellate court, its record-based findings are reviewed *de novo*).

**2.     Mr. Reed's Motion Does Not Reflect An Intent To Cause Unreasonable Delay In The Execution Of Sentence Or The Administration Of Justice**

Chapter 64 contains no deadline for the filing of a motion, and instead requires the movant to show by a preponderance of the evidence that he does not intend to "unreasonably delay the execution of sentence or administration of justice." Tex. Crim. Proc. Code Ann. art. 64.03(a)(2)(B) (West Supp. 2014).  The statute does not require a movant to explain why he did not raise a claim earlier, only that the claim was not made to unreasonably delay the execution of his sentence.  *Id.*; *see also Wilson v. State*, No. AP-76835, 2012 WL 3206219, at *4 (Tex. Crim. App. Aug. 7, 2012) (per curiam) (not designated for publication) (explaining that defendant seeking DNA testing need not show why he did not raise a claim earlier).

Chapter 64 does not provide explicit standards for determining whether Reed met his burden.  However, case law in capital cases demonstrates two clear guideposts: (i) motions filed within a month or less of a scheduled execution date are generally viewed as inadequate to meet the statutory burden; and (ii) motions filed before an execution date is scheduled are generally adequate.  For example, in *Thacker v. State*, 177 S.W.3d 926, 927 (Tex. Crim. App. 2005), the Court found that waiting to move for DNA testing until less than a month before an execution date reflected an intent to cause unreasonable delay.  The Court reached the same

63

conclusion in *Brown v. State*, No. AP-75469, 2006 WL 2069445, at *1 (Tex. Crim. App. 2006) (per curiam) (mem. op., not designated for publication) (finding unreasonable delay when movant filed DNA testing motion until less than one month before scheduled execution). In *Kutzner v. State*, the movant waited to file a DNA testing motion until a mere nine days before his execution date, which the Court found to reflect an intent to unreasonably delay. 75 S.W.3d 427, 441-42 (Tex. Crim. App. 2002), *superseded by statue*, Tex. Crim. Proc. Code art. 64.03, *as stated in Smith v. State*, 165 S.W.3d 361 (Tex. Crim. App. 2005). Cases at the other end of the spectrum include *Holberg v. State*, in which the State conceded that the motion was not filed to cause unreasonable delay where the movant sought DNA testing at a time when no execution date was scheduled. 425 S.W.3d 282, 284 n.12 (Tex. Crim. App. 2014). Similarly, in *Skinner v. State*, the Court overruled a district court's findings of unreasonable delay when the defendant sought DNA testing before a set execution date and while his federal habeas petition was pending. 122 S.W.3d 808, 811 (Tex. Crim. App. 2003).

Mr. Reed's initial request for DNA testing was made in 1999, during his state habeas proceedings, before Chapter 64 was enacted. App. 1. His current requests for DNA testing began over a year ago, with a January 2014 letter to the State requesting agreed testing. The letter was sent three months before the State moved in April 2014 to fix an execution date, and 14 months before Mr. Reed's

currently scheduled March 5, 2015 execution date. After the possibility of agreed testing was exhausted, Mr. Reed filed his DNA testing motion in July 2014. The motion was filed before the District Court fixed his execution date, and eight months before his currently scheduled execution date. Mr. Reed's DNA testing motion and letter request thus objectively satisfy the two clear guideposts embodied in this Court's precedents – namely, that the request made be made at least thirty days before a scheduled execution date, and preferably before such date is scheduled. The District Court's finding to the contrary is in error and should be reversed.

### 3. Mr. Reed Was Not Required To Provide A Time Estimate For Testing (¶ 23a).

The District Court found that Mr. Reed's failure to provide "any information regarding time estimates" for the testing sought was independently sufficient to conclude that he failed to meet his burden to show the absence of an intent to cause unreasonable delay. The court stated "[t]his alone, the Court believes, is sufficient to show Movant has failed in his burden to show that his request is not made to unreasonably delay his execution." C.R. 344, ¶ 23a.

This subsidiary finding apparently was based upon a mistaken impression that Reed was required under the statute to provide an estimate of the likely duration of the movant's requested DNA testing. The District Court cited no authority in support, and Chapter 64 contains no such estimation requirement,

either express or implicit.[28]  The District Court's finding regarding failure to provide a time estimate was based upon a misreading of the statute, is entitled to no deference on appeal, and should therefore be reversed.

Mr. Reed notes that the State did not even argue, in either its opposition brief or at oral argument, that Chapter 64 obligates a movant to provide such a time estimate – presumably because, the State, having agreed to DNA testing on certain items on a consensual basis, was already well aware of the time that such testing might take, *and had so represented to the District Court*.  At the July 14, 2014 hearing, the State conceded that with respect to the agreed-upon items to be tested: "We believe the DNA testing will be completed within a reasonable time frame to consider those results."  R.R. Vol. 1 at 14:3-4.  Accordingly, the *only* findings supported by the record on this issue are that the length of time that Mr. Reed's requested DNA testing would likely take was "a reasonable time," and that the State was well aware of it.  This Court can easily infer that, had the State consented to testing within a reasonable timeframe of Reed's January 2014 request, all such testing would be completed by now.

---

[28]  To the knowledge of Mr. Reed's undersigned counsel, no court has held that a time estimate requirement should be implied from the statute.

### 4. Mr. Reed Should Not Be Faulted For Filing His DNA Testing Motion On The Date The Court Scheduled His Execution (¶ 23b).

The District Court faulted Mr. Reed for filing his DNA testing motion on July 14, 2014, the same day the court scheduled Mr. Reed's execution. C.R. 344, ¶ 23b. The court characterized the timing of Reed's filing "as a designed tactic to delay the setting of Movant's execution date." *Id.* The court's findings are entitled to no deference and should be reversed for at least four reasons.

First, the District Court's finding misapplies the standard. The Legislature expressly recognized the need to delay executions where proceedings on a DNA motion are necessary. *See* Tex. Cod Crim. Proc. Ar. 43.141(d). The question is not whether there is an intent to delay execution, but whether that intent is "unreasonable." *See id.* Art. 64.03(a)(2)(B). Here, Reed filed his motion *before* the hearing held that day, not after, as the court noted elsewhere in its opinion. C.R. 343, ¶ 9. Moreover, Reed's counsel argued at the hearing that day against the scheduling of an execution date in light of both the State's agreement to conduct limited testing on several items, and Mr. Reed's request to conduct DNA testing on a larger group. R.R. Vol. 1 at 5. Accordingly, it was error for the court to treat the filing of the motion as a reaction to the court's subsequent ruling on the State's motion.

67

Second, the District Court erred by drawing a negative inference about the putative intent of Mr. Reed's motion based on its timing without also considering the substantial contrary evidence in the record before it – namely, Reed's efforts in 1999 to obtain DNA testing, and his long-standing more recent prior efforts to reach a consensual agreement with the State to conduct DNA testing over the prior seven months. As the record shows, Reed requested the State's agreement to conduct DNA testing on the murder weapon and other items likely handled by the killer in a letter dated January 13, 2014. C.R. 108-117. Those efforts, which were hampered by months of foot-dragging by the State, eventually culminated in a consensual agreement to conduct DNA testing on certain items.[29] The District Court's Findings and Conclusions - - again, which were drafted by the State and submitted *ex parte* - - omit any meaningful discussion of Reed's prior letter request[30] and the substantial delays in the State's response thereto, and only briefly note in passing the existence of the parties' agreement to conduct DNA testing on certain items. C.R. 346, ¶ 23k; C.R. 347, ¶ 23m.

The court's findings also fail to note the State's sudden insistence on fixing Mr. Reed's execution date. The State filed its execution date motion on April 8, 2014, three months after Mr. Reed's DNA testing letter, and during the period

---

[29] Notably, the subset of items upon which the State ultimately agreed to permit DNA testing do not include the murder weapon or any of the clothing or other items which were likely handled by the killer. *See* p. 7*, infra.*

[30] *See* C.R. 344, ¶ 23d (noting letter sent to State after 5th Circuit issued initial ruling).

when the State was simultaneously dragging its feet in responding to him. The State eventually agreed that DNA testing should occur, but refused to withdraw or even postpone its execution date motion. Mr. Reed should not be penalized with a negative inference based upon the District Court's failure to consider these undisputed record facts and his extensive efforts to reach an agreement with the State before filing his DNA motion – indeed, to do otherwise contravenes the policy underlying Chapter 64, and would encourage convicted persons in the future to file testing motions in the courts without reaching out to the State at all, for fear that such efforts will be held against them.

Finally, the District Court's finding disregards Mr. Reed's efforts in 1999 to obtain DNA testing of the belt and tee shirt. *See* App. 1 (motion requesting testing), App. 2 (State's opposition), and App. 3 (order denying motion). Thus, Mr. Reed's current DNA testing motion is merely the most recent iteration of a 15-year effort to prove innocence through DNA testing of the murder weapon and other key evidence in the case, and cannot be viewed as a "designed tactic to delay the setting of Movant's execution date."

The record demonstrates that the District Court's finding is clearly erroneous. This Court should find instead that Mr. Reed met his burden to demonstrate by a preponderance of the evidence that the filing of his DNA motion

69

on July 14, 2014 was not intended to cause unreasonable delay, in the execution of sentence or administration of justice.

> **5.      The legal basis for the DNA testing requested in this motion was not available until 2011 (¶ 23c).**

In its Findings and Conclusions, the District Court found that there were no legal or factual impediments to Mr. Reed's ability to file a Chapter 64 motion at any time, including during the ten-year period from Chapter 64's initial enactment through the date of the 2011 amendments, and the period after such amendments. (C.R. 344, ¶ 23c). It also found that Mr. Reed had been represented by counsel during such time. *Id.* The Court concluded that Mr. Reed's failure to file his Chapter 64 motion during such period supported a finding of intent to delay.

These findings were in error. As a threshold matter, the statute does not require Mr. Reed to prove that he could not have filed a DNA testing motion sooner than he did. Moreover, the District Court did not consider or discuss the scope of Chapter 64 as enacted or the effect of the 2011 amendments in light of the nature of Mr. Reed's DNA testing motion, which focuses on the presence of "touch" DNA on items handled by Ms. Stites' killer. Prior to the date of the 2011 amendments, a movant could not move to test items handled by a perpetrator for "touch" DNA unless prior testing or analysis had already established the presence of blood, semen, hair, saliva, skin tissues or cells, bone, or bodily fluid. *See Holberg*, 425 S.W.3d at 286 n.24 (discussing *Swearingen v. State*, 303 S.W.3d

70

728, 732 (Tex. Crim. App. 2010) and *Routier*, 272 S.W.3d at 250). The 2011 amendments were enacted with an eye toward the undeniable advancements made in forensic DNA testing science, and, as explained below, now permit a movant to seek DNA testing of perpetrator-handled items. Thus, it was error for the District Court to find that there was no legal impediment to Mr. Reed's ability to file a Chapter 64 motion.

### 6. The 2011 Amendments To Chapter 64

In 2011, the Legislature amended Chapter 64 to expand the right to post-conviction DNA testing to include precisely the sort of "touch" DNA testing that is the subject of Mr. Reed's motion. Mr. Reed thus was obligated to show that the evidence that he seeks to test contains "biological material." Tex. Crim. Proc. Code Ann. art. 64.01(a)(1) (West Supp. 2014). The 2011 amendments substantially broadened the definition to include the italicized language below:

> an item that is in possession of the state and that contains blood, semen, hair, saliva, skin tissue or cells, *fingernail scrapings*, bone, bodily fluids, *or other identifiable biological evidence that may be suitable for forensic DNA testing*.

*Id*. (emphasis added). By including the phrase, "or other *identifiable* biological evidence that *may* be suitable for forensic testing," the Legislature has eliminated any strict requirement that a defendant prove the existence of invisible biological material such as skin cells before being afforded DNA testing.

Had the Legislature wanted to limit such testing to already identified biological material, it would have written the 2011 amendments to refer to "identified" (not "identifiable") biological evidence that "is" (not "may be") suitable for testing, but it did not do so. The legislative history of the 2011 amendments confirms this point. Prior to the 2011 amendments to Chapter 64, this Court required a movant seeking post-conviction DNA testing to prove that the evidence contained "biological material" as a prerequisite to obtaining testing. *See Swearingen v. State,* 303 S.W.3d 728, 733 (Tex. Crim. App. 2010) ("The record is void of any concrete evidence that biological material existed on the evidence sought to be tested."). This Court noted that under its construction of the statute, requiring a movant to prove the existence of even microscopic amounts of biological material prior to testing could lead to instances in which probative DNA testing is denied. *Id*. at 732. The Court held that this issue was for the Legislature to address. *Id*. The Court likewise did not consider submission of DNA test results to the CODIS DNA database because Chapter 64 as it existed in 2010 did not provide for such relief. *See id*. at 736 (noting that Chapter 64 provides for testing and retesting of evidence, not for database entry).

The 82nd Legislature amended Chapter 64 in two important ways. First, the Legislature added a broad definition of "biological material" that included "skin cells," "fingernail scrapings," and a catch-all provision for "other identifiable

72

biological material that may be suitable for forensic DNA testing." Tex. Crim.

Proc. Code Ann. art. 64.01(a)(1) (West Supp. 2014). Written testimony provided

to both the House and Senate Committees specifically cited the need to address this

Court's holdings in *Swearingen* that (1) a movant must prove the existence of

biological material and (2) that Chapter 64 does not provide for submission of

DNA profiles to the CODIS database, and urged expansion of the definition of

"biological material" in light of the *Swearingen* opinion:

> "***Biological material" and advanced DNA technology.***
> Art. 64.01 should also be amended to clarify the definition of
> "biological material" that may be subject to an order for DNA testing
> (a term that is currently undefined, but which should include a wide
> array of evidence that may yield exculpatory DNA results).
>
> The need for this amendment arises from the Court of Criminal
> Appeal's (CCA) opinions in Swearingen v. State, 303 S.W.3d 728
> (Tex. Crim. App. 2010) and Routier v. State, 273 S.W.3d 241 (Tex.
> Crim. App. 2008). In each case, the CCA narrowly interpreted
> "biological material" to deny DNA testing. For example, among other
> things, Swearingen sought to test fingernail clippings, a ligature, and
> contact DNA from the victim's clothing. The trial court denied the
> testing, in part, because Swearingen could not show that these items
> contained biological material suitable for DNA testing. However, in
> doing so, the CCA recognized that its narrow interpretation of
> biological material might "lead to the deprivation of DNA testing in
> the rare case simply because of the inability to ascertain whether or
> not biological material exists." Swearingen at 732. ***The CCA***
> ***recognized that while its hands were tied, it invited the legislature to***
> ***correct this glitch in the statute by providing a definition of***
> ***"biological material."***
>
> Clarifying amendment to Art. 64.01 would reflect the reality of
> how biological evidence is collected and DNA testing is performed.
> For example, it is precisely because fingernail clippings often contain

DNA from perpetrators that they are routinely collected from victims after violent crimes. Indeed, fingernail clippings are collected even without knowing in advance that they definitively contain skin cells or other DNA from the perpetrator. It is only after the DNA testing is performed that the full probative value of the fingernail clippings is known. The same analysis is true for ligatures.

Hearing on S.B. 122 Before Senate Crim. Justice Comm., 82nd Leg., R.S. (March 22, 2011) (written testimony of the Innocence Project) (emphasis added); *see also* Hearing on S.B. 122 Before Senate Crim. Justice Comm., 82nd Leg., R.S. (March 22, 2011) (oral testimony of Natalie Retzel, Chief Staff Attorney, Innocence Project of Texas); Hearing on S.B. 122 Before House Crim. Jurisprudence Comm., 82nd Leg., R.S. (May 10, 2011) (written testimony of the Innocence Project). Likewise, the addition of the CODIS provision in 2011 following the rejection of the right to such a comparison in the 2010 *Swearingen* opinion make it clear that the Legislature intended to address the limited holding in that case. *See id.* (Innocence Project testimony on CODIS provisions). There was little debate on these popular amendments, and they passed the Senate unanimously and the House by vote of 145 (yea)-4 (nay)-1 (present, not voting). *See* S.J. of Tex., 82nd Leg. R.S. 955 (2011); H.J. of Tex., 82nd Leg., R.S. 4364 (2011).

These statutory responses became effective on September 1, 2011. The expanded definition of "biological material" and the new CODIS provision clearly provide Mr. Reed a new legal basis for his request for DNA testing. Because

74

Reed's last habeas application was filed before the September 1, 2011 effective date of the amendments, the legal basis for his DNA testing motion was "unavailable" as a matter of law, as explained below. The District Court's finding to the contrary was legal error and should be reversed, along with its "umbrella" finding that Reed failed to meet his preponderance burden to show a lack of intent to cause unreasonable delay.

**7. Mr. Reed Suffered From A Legal Impediment Prior To The 2011 Amendments.**

A legal impediment to the assertion of a claim cannot constitute intent to cause unreasonable delay, as this Court explained in relying upon the successive application provision of the capital habeas statute. *See Kutzner v. State*, 75 S.W.3d 427, 442 (Tex. Crim. App. 2002) (citing section 5 of Tex. Crim. Proc. Code Ann. art. 11.071), *superseded by statue*, Tex. Crim. Proc. Code art. 64.03, *as stated in Smith v. State*, 165 S.W.3d 361 (Tex. Crim. App. 2005). Section 5 of article 11.071 allows for the filing of a successive habeas corpus application only where the new claims brought were unavailable at the time the prior application was made. *See* Tex. Crim. Proc. Code Ann. art. 11.071, § 5(a)(1) (West Supp. 2014). A claim is defined as "unavailable" under section 5 if the legal basis for the claim was not yet recognized at the time the prior application was filed. *See id*. § 5(d).

As discussed *supra*, the Legislature specifically broadened Chapter 64's definition of "biological material" to include skin cells and fingernail scrapings in

75

2011.  The Legislature also eliminated the "fault" provision from article 64.01.  *See* Appendix D (S.B. 122 Enrolled showing markup).  And finally, the Legislature also added a provision specifically requiring DNA Profiles to be compared to CODIS during the 2011 session of the 82nd Legislature. [31]  These statutory responses to the denial of prior DNA testing in the *Swearingen* did not become effective until September 1, 2011.  And the expanded definition of "biological material" and the new CODIS provision clearly and intentionally provide Mr. Reed a new case legal basis for his request for DNA testing.  Accordingly, before the September 1, 2011 amendments to Chapter 64, the legal basis for Mr. Reed's DNA motion was "unavailable." *See* Tex. Crim. Proc. Code Ann. art. 11.071, § 5(a), (d).  Accordingly, Mr. Reed's motion proceeding was not brought for the purposes of delay.  *See Kutzner*, 75 S.W.3d at 442.

**8.    The District Court's "Intent" Inferences Drawn From Mr. Reed's Post-Conviction Proceedings Are In Error And Should Be Reversed (¶¶ 23d-g, l-m)**

The District Court identified several selected events from Mr. Reed's post-conviction proceedings, and inferred that such events showed that Mr. Reed's Chapter 64 Motion was made to unreasonably delay the execution of his sentence. (C.R. 344-45, ¶¶ 23d-g).  The District Court found the fact that Mr. Reed's first

---

[31]    During the legislative process, the Innocence Project told both the House and Senate committees considering the amendments that the definition of "biological material" should be broadened in light of the opinion in *Swearingen*. ROA 53-55.

request for DNA testing occurred shortly after the Fifth Circuit affirmed the denial of his federal petition for writ of habeas corpus "diminishes Movant's case that his present Chapter 64 motion was not filed for purposes of unreasonable delay." (*Id*. ¶ 23d). Second, the court surmised a "purposeful attempt at delay" based on the fact that Mr. Reed's counsel filed a Chapter 64 motion for another client, Mr. Swearingen, before filing Mr. Reed's motion. (*Id*. ¶ 23e). Third, the court found that prior rulings concerning the timeliness of certain of Mr. Reed's submissions caused it to believe the Chapter 64 Motion is a "continuation" of "a dilatory and piecemeal litigation strategy." (*Id*. ¶ 23f). Fourth, the District Court also found that Mr. Reed oppositions to scheduling an execution date (all of which occurred several months after he requested DNA testing) "works against him in proving that he is not unreasonably attempting to delay is execution." (*Id*. ¶ 23g). Finally, the Court observed that Mr. Reed had not yet filed additional motions for relief pursuant to Articles 11.071 and 11.073, an act of perceived "procrastination" and "another example of any attempt to unreasonably delay his execution." (*Id*. ¶ 23l).

As a threshold matter, the Court should review these findings *de novo*, as they all are based upon the court's evaluation of selected items from the record of Mr. Reed's post-conviction litigation, and the record of motions made by Mr. Reed's counsel on behalf of a *different client* in an unrelated case. None of the findings reflect credibility or motivation determinations based upon the testimony

77

of Mr. Reed or any witness that testified at the November 25, 2014 hearing. *See Smith v. State*, 165 S.W. 3d 361, 363 (Tex. Crim. App. 2005) (lower court findings based upon review of record are reviewed *de novo*).

Each of the foregoing findings suffer from a fundamental failure to meaningfully connect the historical record of Mr. Reed's post-conviction proceedings with an intent "to unreasonably delay the execution of sentence or administration of justice." *See* Tex. Crim. Proc. Code Ann. art. 64.03(a)(2)(B) (West Supp. 2014). Although the statute does not require Reed to explain why he did not file a DNA testing motion sooner than he did, the more cogent inference from the fact that Reed sought the State's consent to agree to DNA testing days after the Fifth Circuit denied his petition for writ of habeas corpus and before he moved for rehearing – more than a year ago – is that Reed and his counsel believed that such testing could have, and should have, been completed before any scheduled execution date, especially since the State had yet to move for setting of an execution date. *See Holberg*, 425 S.W.3d at 284 & n.12 (State conceded that the motion was not filed to cause unreasonable delay when DNA testing sought before execution date scheduled); *Skinner v. State*, 122 S.W.3d 808, 811 (Tex. Crim. App. 2003) (overruling district court's findings of unreasonable delay when DNA testing sought before execution date set).

Similarly, Mr. Reed can hardly be blamed for opposing the setting of his execution date in a capital case, for a crime he did not commit, especially when the State's request to fix such date was made *after* Reed sought the State's agreement to conduct DNA testing. Likewise, neither the timing of the filings of DNA motions by Reed's counsel on behalf of another client in an unrelated case, nor the complex post-conviction proceedings in this case, support a finding that Reed's own Chapter 64 Motion was filed for the purpose of unreasonably delaying his (at the time) unscheduled execution. The State did not move to set Reed's execution date until April 2014, three months *after* Reed asked for cooperative DNA testing. C.R. 34-35. Moreover, the State dithered about for months before eventually rejecting the majority of Mr. Reed's testing requests. The District Court's finding that Reed's DNA request was designed to unreasonably delay execution of sentence is flatly contradicted by the record and should be reversed.

In addition, that Mr. Reed had not yet filed an Article 11.071 or 11.073 motion at the time he sought DNA testing by motion can hardly count against him, as the court's "finding" states. C.R. 346, ¶ 23l. The finding lacks record support from the moving papers and hearing, and, in any event, whether or when Mr. Reed filed an unrelated post-conviction motion based on new evidence (including that recently provided by the State) is irrelevant to whether the intent of his January

79

2014 DNA request and subsequent motion was to unreasonably delay an execution date that had yet to be scheduled.[32]

The statute requires the movant show by a preponderance of the evidence that his request was not made to "unreasonably delay the execution of sentence." Tex. Crim. Proc. Code Ann. art. 64.03(a)(2)(B). The facts stated by the District Court in subparagraphs 23(d-f) of its Findings and Conclusions do not demonstrate such an intent, and do not constitute a permissible statutory basis for denying Mr. Reed's Chapter 64 Motion. *See Wilson v. State*, No. AP-76835, 2012 WL 3206219, at *4 (Tex. Crim. App. Aug. 7, 2012) (per curiam) (not designated for publication) (statute does not require movant to show why he did not raise a claim earlier).

### 9. Mr. Reed Provided Ample And Adequate Notice To The State of the Items Which He Sought To Test (¶¶ 23h-j).

The District Court's eighth and ninth subsidiary findings of fact state that Reed failed to enumerate certain specific items for which he sought testing until the hearing on his DNA Motion. (C.R. 345-346, ¶¶ 23h-i). Thus, the findings state, Reed unreasonably delayed in bringing his DNA motion because he never explained or briefed the items to be tested and he has no excuse for not being more

---

[32] Mr. Reed filed the referenced application for a writ of habeas corpus on February 13, 2015. *See* App. 5.

80

specific in his briefing.  The record demonstrates that these findings should be reversed for at least three reasons.

First, Mr. Reed's DNA Motion provided precisely the level of specificity contemplated by Chapter 64.  *See* Tex. Crim. Proc. Code Ann. art. 64.01(b) ("motion may request forensic DNA testing only of evidence… secured in relation to the offense that is the basis of the challenged conviction and was in the possession of the state during the trial of the offense" and which meets certain testing criteria).  Reed's opening brief identified in its text at least 10 specific items or categories of evidence to be tested, including the belt, Stites' clothing, hairs, the name tag, the white tee shirt, items collected from near the truck, and samples taken from Stites' body, among other specified items.  C.R. 76-77.  In addition, the DNA Motion included as an incorporated exhibit the same list of over 30 specific items for testing included in Reed's January 2014 pre-filing letter request to the State. C.R. 115-17.  This was direct, specific and unambiguous  notice to the State of the evidence that Reed sought to test.  Indeed, the State's response contains a detailed enumeration of the items the State believed were the subject of Reed's request, thereby demonstrating that the State received and comprehended Reed's request.  C.R. 172-73.

Moreover, the State, for the first time in its response, provided complete documentation of the evidence actually available for testing.  The inventory of the

evidence from the Attorney General's Office – where the beer cans and other important items from the truck are held – was produced for the first time to Reed in the State's response on September 9, 2014.  C.R. 222-24.  The State was not in any way prejudiced by the level of specificity Reed provided in his initial motion.[33] The District Court's findings to the contrary are baseless and should be reversed. Moreover, the information provided in Reed's DNA Motion was supplemented through  the testimony of Detective Paolucci at the hearing.  He discussed more than two dozen specific items of evidence to be tested.  *Cf. Dinkins v. State*, 84 S.W.3d 639, 642 (Tex. Crim. App. 2002) (convicted person must do more than merely assert chapter 64's requirements have been met). Indeed, the State repeatedly objected to Paolucci's  enumeration of specific items at the hearing, *but the State was overruled every time.*  R.R. Vol. 2 at 32.  Such overruled objections provide no support for the District Court's findings, and they should therefore be reversed.

### 10.    The District Court Erred In Finding That Reed Made Redundant Testing Requests  (¶¶ 23j- m).

The District Court made subsidiary findings to the effect that Mr. Reed intended to cause delay by including items within his motion that were either in

---

[33]    The State's protests to the contrary are belied by the State's opposition to the motion, which included a lengthy itemization of the items of evidence which the State understood to be at issue.  C.R. 172-73.

Reed's possession or that the State had already agreed to test. C.R. 346, ¶¶ 23j-m. These findings are baseless.

First, paragraph 23j refers to the "State's evidence," a single paper exhibit introduced by the State at the end of the DNA hearing after all testimony had been heard, which in turn lists certain extracts located at Technical Associates Laboratory. R.R. Vol. 4 at 205. There was no testimony provided regarding these samples at the hearing or in any of the moving papers. The listed extracts are primarily redundant of those that are being tested under the State's agreement, and do not include the most probative items that were the subject of the hearing. Moreover, the State expressly refused to conduct any agreed testing through the Chapter 64 process, *see* C.R. 144-48; by doing so, the State deprived Reed of the Court's supervision of the process, the ability to seek a hearing on innocence, and the right to mandatory DNA database comparison. *See e.g.,* Tex. Code Crim. Proc. Art. 64.035; 64-04. And most importantly, the potential to test the leftover scraps from the defense's 1998 DNA testing is no substitute for comprehensive DNA testing of the relevant evidence discussed in this brief. The court's finding to the contrary is simply unsupported.

Second, the court found that Reed intended to cause unreasonable delay because he sought testing under Chapter 64 on items that the State has already agreed to test. C.R. 366, ¶ 23k. This finding makes little sense; by the November

hearing, the items that were subject to agreement had already been determined. To avoid any doubt, at the hearing, Reed's counsel withdrew on the record any possibly duplicative requests to test items that the State had already agreed to. R.R. Vol. 3 at 160. There was neither prejudice nor confusion on this point, and the court's finding reflects a misunderstanding of the record facts, not evidence of an intent to cause unreasonable delay.

This finding is also error for a second, more troubling reason. Absent Chapter 64 relief, a convicted person has no independent legal right or ability to cause DNA test results to be processed through state and federal DNA databases. Although the State may do so at any time, a convicted person's legal right to access such databases *only* arises upon entry of a District Court order directing DNA testing to occur. Tex. Crim. Proc. Code Ann. art. 64.035 (West Supp. 2014). Thus, the only mechanism by which a convicted person may seek database comparison of DNA test results is to include the evidence at issue in a Chapter 64 motion, without regard to whether the evidence to be tested is in the current possession of the State, the convicted person, or a third-party laboratory. It cannot have been the intent of the Legislature to provide a convicted person with a right to seek DNA testing of evidence regardless of its location, and a resulting right to cause the results to be cross-checked against state and federal offender databases – a right which only exists if testing is ordered – while permitting a court to consider

84

the very making of such a request as a factor that may warrant denial of the motion. *Cf. Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991) (court should avoid interpretation of statute that "would lead to absurd consequences that the Legislature could not possibly have intended" (emphasis omitted)). The District Court's finding that Mr. Reed's DNA testing motion demonstrated an intent to cause unreasonable delay because it included within its scope evidence or extracts to which Mr. Reed had access disregards this fundamental point, would lead to an absurd construction of Chapter 64, and should therefore be reversed.

Third, the court found that Reed "waited more than four months to obtain a subpoena for a reference sample from himself for purposes of the agreed-to DNA testing that this Court ordered in July" and thus, this is evidence of his desire to bring the Chapter 64 motion to unreasonably delay his sentence. C.R. 367, ¶ 23n. This finding is, again, devoid of support and reflects a misunderstanding. There was no testimony provided at the hearing on this topic, and the State mentioned it for the first and only time in closing argument. Regardless, it is apples and oranges - - the reference sample was for the evidence that the parties had previously *agreed* to test, not for the items which Reed sought to test via the motion. Reed denies that he intended to or did delay in providing a reference sample[34] in any event, but even so, the time it took to do so is entirely separate and distinct from whether

---

[34] Reed notes that the testing facility already had a reference sample from Reed, and that the issue of a subpoena was based on the State's request for a new sample. C.R. 219

Reed's *motion* is intended to cause unreasonable delay - - the two are separate events.

**D.     Mr. Reed Met His Burden Under Article 64.01 With Respect To Chain of Custody And Biological Evidence.  (Issue 3)**

The District Court made no findings with respect to whether Mr. Reed met his burden under Article 64.01 as to chain of custody and biological evidence.  The District Court's silence on these requisite elements constitutes a presumptive finding that the elements have been satisfied.  *See Skinner v. State*, 122 S.W.3d 808, 809 n.1 (presumption that elements as to which no findings are made have been satisfied).  To avoid any further delays in proceeding with DNA testing, Reed respectfully requests that the Court conclude that the failure to make findings in this case presumptively demonstrates that Reed met his burden or, alternatively, find that the record demonstrates Reed has established chain of custody and that the evidence he seeks to test contained biological evidence.

**1.     Mr. Reed Has Established Chain Of Custody.**

At the hearing, Reed established – and the State did not contest – chain of custody as to the evidence in the possession of two of the three custodians (the Attorney General's Office and the Department of Public Safety Crime Lab).  Mr. Reed further established that chain of custody was complete as to evidence in the possession of the Bastrop Country Clerk.

86

There is no real dispute about where the evidence has been – the question at the heart of any chain of custody inquiry – and the record (including testimony of the State's own witnesses) demonstrates that the evidence has been in the State's custody and not compromised so as to preclude meaningful DNA analysis. First, the State's Sergeant Investigator, Gerald Clough, testified at the hearing that he could not "identify anything on [the list of items in the State's evidence locker] that has been substituted, replaced, tampered with, or materially altered." R.R. Vol. 4 at 188:12-189:20. Neither did Mr. Clough have "any reason to suspect that anything in [the locker] would have been materially altered, tampered with, substituted, or replaced." *See id*. Similarly, Ms. Etta Wiley, Criminal Deputy Clerk for the Bastrop County Clerk's Office, corroborated the sufficiency of the chain of custody. Ms. Wiley's job involves ensuring that people do not tamper with, materially alter, substitute, or replace items within her custody. R.R. Vol. 4 at 196:9-197:19. Ms. Wiley testified that the box of relevant evidence has remained "under lock and key" and that with "some confidence," all of the relevant evidence has "not been substituted, replaced, tampered with, or materially altered." *See id.* at 195:13-196:19 Ms. Wiley, like Mr. Clough, could not supply the Court with "any reason to suspect that anyone has substituted or replaced, tampered with, or materially altered" the items in the box within her custody. *Id.* at 196:16-19.

87

Given Mr. Clough and Ms. Wiley's unrebutted statements, which track the very language of the relevant part of statute, Mr. Reed has established chain of custody.

This Court has held that nothing more is required to establish chain of custody: "The chain of custody is conclusively proven if an officer is able to identify that he or she seized the item of physical evidence, put an identification mark on it [and] placed it in the property room." *Stoker v. State*, 788 S.W.2d 1, 10 (Tex. Crim. App. 1989), *abrogated on other grounds by Horton v. California*, 496 U.S. 128 (1990). Such proof of chain of custody creates a presumption that the evidence was not tampered with or altered. *See id*. (noting that chain of custody is presumptively established absent proof "of tampering or alteration"). The plain language of article 64.03(a)(1)(A)(ii) in the context of the case law on chain of custody, clearly indicates that the Legislature did not intend to place any additional burden on movants for DNA testing than the typical chain of custody showing required in most criminal cases. In addition, the legislative history indicates the Legislature intended that the requirements of Chapter 64 "would be minimal so as not to bar inmates unfairly from receiving tests." Texas Bill Analysis at 6, S.B. 3, March 21, 2001. Specifically with regard to the chain of custody requirement, the legislative history states that "[a] defendant's lawyer could establish those facts easily by requesting copies of reports from law enforcement officials." *Id.* at 7. Therefore, a showing of the chain of custody defined under Texas law is sufficient

88

to establish that the evidence "has not been substituted, tampered with, replaced, or altered in any material respect." Tex. Crim. Proc. Code Ann. art. 64.03(a)(1)(A)(ii) (West Supp. 2014).

Chain of custody is distinct from whether evidence may or may not be contaminated, but the District Court's Findings and Conclusions impermissibly conflate the two concepts. That the treatment of the evidence at trial may have resulted in the deposit of additional DNA on various items neither defeats Reed's proof of chain of custody, nor shows that the evidence no longer contains exculpatory DNA information. *See* Affidavit of Deanna Lankford C.R. 244. Possible contamination and issues of care are relevant only to the evidence's weight, not to the chain of custody. *See Stoker,* 788 S.W.2d at 10; *see also Medellin v. State*, 617 S.W.2d 229, 232 (Tex. Crim. App. 1981).

### 2. Mr. Reed's Unrebutted Expert Established That The Evidence He Seeks To Test Contains Biological Evidence.

Article 64.01 of the Texas Code of Criminal Procedure permits a convicted person to seek DNA testing of "evidence containing biological material." Tex. Crim. Proc. Code Ann. art. 64.01(a-1) (West Supp. 2014). The Legislature has broadly defined "biological material" to include, in addition to an enumerated list,

any item that contain "identifiable biological evidence that may be suitable for forensic DNA testing." *Id*. art. 64.01(a)(1).[35]

In support of his DNA Motion, Mr. Reed offered the affidavit of a well-qualified forensic DNA expert, Deanna Lankford, who opined that, to a reasonable degree of scientific certainty, the items that Reed seeks to test contain biological material suitable for DNA testing. *See* Statement of Facts *supra* at 24-25; Affidavit of Deanna D. Lankford, M.T. (ASCP), C.R. 247-48, ¶¶ 15-18; *see also id*. ¶ 23 (belt ligature), ¶¶ 24-26 (victim's clothing), ¶ 27 (condom); ¶ 28 (hair); ¶ 29 (name tag); ¶ 30 (fingerprint); ¶¶ 32-33 (samples of biological material contained on swabs taken from the victim). Ms. Lankford confirmed her opinion during her testimony at the hearing on Reed's motion on November 24, 2014. *See* Statement of Facts *supra* at 27; R.R. Vol. 3 at 114, 142.

Despite its aggressive opposition to the Motion, and access to free experts from the DPS crime lab, the State declined to offer any rebuttal testimony to refute Ms. Lankford's credible opinion. Based on Ms. Lankford's unrebutted testimony and the unrefuted record, Mr. Reed submits that he has satisfied his

---

[35] Whether Chapter 64 requires that a person conclusively prove the existence of biological evidence, as opposed to showing that its existence is probable or likely, is an unresolved issue. *See Holberg v. State*, 425 S.W.3d at 286 n.24 (questioning but not deciding whether the 2011 amendment to Chapter 64 "operates to lessen the burden on . . . movants to prove the existence of biological material" as set forth in *Swearingen v. State*, 303 S.W.3d 728, 732 (Tex. Crim. App. 2010) and *Routier v. State*, 273 S.W.3d 241, 250 (Tex. Crim. App. 2008)). That issue is presently before the Court in the State's appeal in *State v. Swearingen*, No. AP-77020 (submitted by the Clerk on January 21, 2015). Under either standard, the unrebutted evidence Reed presented at the Hearing satisfied Article 64.01.

burden under Article 64.01 with respect to chain of custody and biological

evidence without regard to whether the applicable standard is based upon proof or

probability.[36]

---

[36] The State's position now appears to be that Mr. Reed was required to prove that forensic DNA analysis will conclusively identify biological material on the items to be tested, rather than prove (or demonstrate that it is probable or likely) that the items contain "identifiable biological evidence that may be suitable for DNA testing." This interpretation is unsupported by the plain language of the statute, and further seeks to impose a standard that could never be satisfied with respect to microscopic biological material such as a few skin cells or other trace evidence.

**CONCLUSION AND PRAYER**

As the United States Supreme Court observed in *District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52, 55 (2009), "DNA testing has an unparalleled ability both to exonerate the wrongly convicted and to identify the guilty." Rarely has a more suitable case for DNA testing been presented. DNA testing of the belt used to strangle Stacy Stites and other evidence handled by her killer has the unparalleled ability to conclusively prove Mr. Reed's claim of innocence and identify her killer. The District Court's Findings and Conclusions should be reversed, for the reasons noted above, and the evidence that is the subject of Reed's Chapter 64 motion should be subjected to DNA testing.

Respectfully submitted,

/s/ Bryce Benjet
Bryce Benjet
State Bar No. 24006829
THE INNOCENCE PROJECT
40 Worth St.
New York, NY 10013
(212) 364-5340
(212) 364-5341 (fax)

Andrew F. Macrae
State Bar No. 00784510
LEVATINO/PACE LLP
1101 S. Capital of Texas Highway
Building K, Suite 125
Austin, Texas 78746
(512) 637-8565
(512) 637-1583 (fax)
*ATTORNEYS FOR RODNEY REED*

## CERTIFICATE OF SERVICE

I, Bryce Benjet, do hereby certify that a true and correct copy of the foregoing Brief was served on this 17th day of February, 2015 by first-class U.S. mail on the following:

Matthew Ottoway
Assistant Attorney General
Bastrop County, Texas
P.O. Box 12548
Capitol Station
Austin, Texas  78711

/s/ Bryce Benjet_____
Bryce Benjet


## CERTIFICATE OF COMPLIANCE WITH TEXAS
## RULE OF APPELLATE PROCEDURE 9.4(I)(3)

In accordance with Texas Rule of Appellate Procedure 9.4(i)(3), I, Bryce Benjet, hereby certify that the foregoing electronically created document has been reviewed by the word count function of the creating computer program, and has been found to be in compliance with the requisite word count requirement.

/s/ Bryce Benjet_____
Bryce Benjet